[S. F. No. 11352.  In Bank.—February 21, 1925.]

In the Matter of the Controversy Between the CITY AND COUNTY OF SAN FRANCISCO et al. and THOMAS F. BOYLE, as Auditor of Said City.

[1] Municipal Corporations—Power to Lease—Charters—Statutory Construction.—It is a general rule of interpretation applicable to charters that the broad power to purchase, receive, hold, and enjoy real and personal property embraces and includes the lesser power to lease the same classes of property.

[2] Instruments—Character of—How Determined.—The character of an instrument is not to be determined from the name given it by the parties, nor in any particular provision it contains disconnected from all others, but in the ruling intention of the parties gathered from all the language they have used.

[3] Municipal Corporations—Powers—Limitations.—While the trend of authority in more recent years has been in the direction of per-

---

1.  Right of municipality to lease public property to private person, note, 16 Ann. Cas. 1096.  See, also, 19 R. C. L. 771; 18 Cal. Jur. 1026.

3.  See 19 R. C. L. 768; 18 Cal. Jur. 800.

mitting municipalities a wider range in undertaking to promote the public welfare or enjoyment, the elementary rule still obtains that they have only the powers expressly conferred and such as are necessarily incident to those expressly granted, or essential to the declared objects and purposes of the corporation.

[4] Id.—Validity of Acts—Determination of.—However worthy the motive or advantageous to the public the result sought to be attained, municipal corporations being public bodies of limited powers, the validity of their acts must be judged by an examination of the charter or law defining their powers rather than by a view of the purposes or results of those acts.

[5] Id.—Agreement—Construction.—Where an agreement between a municipal corporation and a private corporation, although designated a lease therein, declares that the purpose for which the latter has obtained options to purchase certain lands upon which it is proposed to erect a building for certain exhibition purposes, designed to stimulate the business and welfare of the city, and that the property shall immediately come under the control of the city and shall ultimately be owned by it, the latter being given an option to purchase the same, at actual cost, it being provided that the city shall make a certain initial payment and thereafter certain annual payments, together with the profits from the use of the property, to a trustee, not as rental, but to apply the payments to the discharge of bonds issued by the private corporation for the purpose of raising money to purchase the real property and erect the building, the contract must be construed as an agreement of conditional sale to the municipality.

[6] Id.—Section 18, Article XI, State Constitution — Void Contract.—Under section 18 of article XI of the state constitution, a contract of a municipality which imposes indebtedness or liability upon it exceeding in any year the income and revenue provided for such year, wthout the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose, is void.

[7] Id.—Mandate—Evidence—Burden of Proof.—In a proceeding for a writ of mandate to compel the auditor of a municipality to audit a demand for the initial payment under such contract, where the agreed statement of facts upon which the case was submitted shows that the auditor refused to approve the claim upon the ground that by said agreement the municipality incurred an indebtedness and liability exceeding in each of the years of the term of the contract the income and revenue provided for such

6. Right of municipality to contract for periodical payments through term of years in aggregate exceeding authorized debt limit, notes, 7 Ann. Cas. 150; Ann. Cas. 1913B, 1177. See, also, 19 R. C. L. 983; 18 Cal. Jur. 883.

year, without the assent of two-thirds of the qualified electors voting at an election held for that purpose, in violation of section 18 of article XI of the state constitution, it was incumbent upon the petitioners to show that the objection was not founded in fact.

[8] Id.—Violation of Charter Provisions. — Where the stipulation and averments in such a proceeding show that the charter provisions of said municipality (section 29 of article XVI), relating to the acquisition of property for public uses, have not been complied with and that the refusal of the auditor to approve the demand for the initial payment was upon the ground that it created obligations exceeding the income and revenue of the municipality for each and every year during the term thereof, which ground of refusal was not controverted, it must be held that the agreement was wholly void as being in violation of said charter provisions.

---

(1) 28 Cyc., p. 609, n. 7.    (2) 13 C. J., p. 521, n. 15, 16, p. 525, n. 41, 42.    (3) 28 Cyc., p. 260, n. 50.    (4) 28 Cyc., p. 266, n. 14 New.    (5) 28 Cyc., p. 609, n. 7, p. 679, n. 46.    (6) 28 Cyc., p. 1540, n. 36, p. 1560, n. 68.    (7) 38 C. J., p. 914, n. 48.    (8) 28 Cyc., p. 1548, n. 27, p. 1550, n. 49, 50, p. 1560, n. 68.

APPLICATION for a Writ of Mandate to compel the auditor of a municipality to approve a certain demand for public improvements.    Writ denied.

The facts are stated in the opinion of the court.

George Lull, City Attorney, and Chas. S. Perry, Assistant City Attorney, for the City and County of San Francisco.

Edward F. Moran for Thos. F. Boyle, Auditor of the City and County of San Francisco.

Chauncey F. Eldridge and George O. Bahrs for San Francisco Exposition Company.

H. W. Hutton, *Amicus Curiae.*

Wright, Wright & Stetson for San Francisco Chamber of Commerce, *Amicus Curiae.*

Edgar D. Peixotto, *Amicus Curiae,* for Central Bureau and Program Committee of San Francisco Organizations,

California Industries Exposition and Down Town Association.

RICHARDS, J.—This application for a writ of mandate was presented to this court upon an agreed statement of facts. The petitioners purport to make the application under the provisions of sections 1138 to 1140, inclusive, of the Code of Civil Procedure, which relate to the submission of controversies which might be the subject of a civil action to courts which would have jurisdiction of such action, upon an agreed statement of facts. It is not necessary to determine whether these sections of the code have application to the submission of causes to this court, since the facts set forth in the application herein would suffice to support the issuance of a writ of mandate if, as a matter of law, such writ should issue. The stipulation of the respondent, taken with his appearance upon the hearing, amounts to a return admitting the facts, but demurring to the sufficiency of the application as a matter of law. The petitioners herein seek to compel the respondent, as auditor of the city and county of San Francisco, to audit and approve a certain claim and demand in favor of the petitioner San Francisco Exposition Company in the sum of $100,000, based upon certain proceedings had and taken by and before the board of supervisors of the city and county of San Francisco, pursuant to which a certain agreement was entered into between said municipality and the exposition company by which agreement the payment from the former to the latter of the said sum of $100,000 was provided for. The questions presented for our consideration upon this application involve the validity of said agreement. From the agreed statement of facts herein it appears that the board of supervisors of the city and county of San Francisco in its budget for the fiscal year ending June 30, 1924, under the head of "Miscellaneous accounts under the control of the board of supervisors," included the following item: "No. 82. To initiate the development and improvement of the Marina—$100,000.00." The "Marina" referred to in the foregoing allocation of said sum of money consists of several blocks of land in the northern portion of said municipality lying along the shore line, near the Golden Gate entrance to San Francisco Bay, and being intersected by several public streets, but at present unoc-

cupied by any substantial improvements. On April 28, 1924, the said board of supervisors passed and adopted the following resolution, which was, on May 9, 1924, approved by the mayor, viz.:

"Resolution No. 22387. New Series. Resolved that the sum of $100,000 be and the same is hereby set aside and appropriated out of 'To initiate development and improvement of the Marina,' budget item 82, fiscal year 1923–1924, authorized in payment to San Francisco Exposition Company, as first payment for certain grounds and buildings to be used for exposition grounds and buildings pursuant to subdivision A, section 2, of that certain agreement, approved March 27, 1924, by ordinance No. 6180 (New Series), between San Francisco Exposition Company, a corporation, and City and County of San Francisco."

The petition herein alleges that pursuant to said resolution and of the agreement referred to therein, and on April 30, 1924, a demand was duly presented to the respondent herein as auditor of the city and county of San Francisco for the audit and approval of said claim for said sum of $100,000, and that the said respondent refused to audit or approve said claim and demand, and still refuses so to do, basing his said refusal upon certain specified objections going in the main to the validity of the said agreement upon which said claim and demand were based. The agreement referred to in the foregoing resolution and demand purports to have been entered into between the San Francisco Exposition Company, a corporation, and the city and county of San Francisco, and bears date of April 16, 1924. It embraces a description of the several blocks of land above referred to. It recites that:

"Whereas, it has been proposed that the Company construct on said tracts of land a building suitable for the holding therein of agricultural exhibits and fairs, exhibitions of horses, cattle and other livestock, and of agricultural, viticultural, mechanical, manufacturing and domestic products, pageants, athletic exhibitions and other exhibitions and performances designed to foster and stimulate the business and welfare of the people of the city:

"And whereas, by reason of the public nature of the purposes for which said premises are to be used, it is desirable that the same should immediately come under the control of the city and should ultimately be owned by it;

"And whereas, the Company proposes to raise the funds necessary to acquire said lands and to construct thereon said building by authorizing and selling an issue of its bonds in the amount of one million two hundred thousand (1,200,000) dollars secured by first mortgage upon said premises, and an issue of its bonds in the amount of six hundred thousand (600,000) dollars secured by second mortgage upon said premises, each of which mortgages shall be executed by the Company to Anglo-California. Trust Company, as Trustee (hereinafter termed the 'Trustee'), and shall each bear date the 1st day of January, 1924."

Following these recitals the agreement proceeds to provide that the exposition company shall proceed to acquire the foregoing tracts of land and to construct thereon a building substantially in accordance with plans and specifications, which are annexed to said agreement, and which building is after its construction to be approved by the architect of said exposition company, whose approval thereof is to be binding upon both of the parties to said agreement. The agreement then proceeds to state that "The Company hereby leases said premises to the City for the term commencing with the 31st day of December, 1924, and ending with the 15th day of December, 1941, subject to and in consideration of the following conditions and agreements of the City, to wit": Then follow the terms and conditions of said agreement, the first of which is the requirement that the city of San Francisco shall forthwith pay to the exposition company the sum of $100,000. It is the payment of said sum to the demand for which the respondent refuses to give his official audit and approval.

The agreement further provides:

"2. (a) The City agrees to pay to said Trustee, for account of the Company, in gold coin of the United States, the following sums strictly at the times following, to wit: . . . on the 15th day of December of each of the years from and including 1924 to and including 1941, the sum of one hundred and eighty-five thousand (185,000) dollars. Any of said sums in this Section 2 mentioned, or any part thereof, may, at the option of the City, be paid prior to the date herein specified for the payment thereof.

"(d) Said lease shall take effect on the date in this section above specified as the time of commencement of the term

thereof, and all payments in this indenture agreed to be made by the City shall be made at the times hereinabove specified, notwithstanding said building shall not be then completed.

"(h) Said lease shall not terminate, nor shall the City be relieved of its obligation to make the payments, or any thereof herein specified, by reason of loss or damage by fire or otherwise to said building; but the City in such event shall, with reasonable diligence cause said building to be restored, and for this purpose it shall be entitled to use (so far as required) all insurance moneys received and held by said Trustee.

"(k) The City further agrees that, during the term of this agreement, it shall include in each of its annual budgets such amounts and sums as shall be requisite in order that the payments herein required to be made by the City shall be made at the time and in the manner herein specified, and that it will also take any and all other steps necessary or advisable in order that each and all of its covenants herein contained may be performed as herein provided. The City further agrees that in the event that it shall fail to perform any of its agreements in this indenture contained, and any suit or suits shall be brought by the Company and/or by said Trustee against the City or any of its officers in respect thereof, which suit or suits shall result in judgment in favor of the Company and/or said Trustee, the city will pay on demand the reasonable costs and attorneys' fees of the Company and/or Trustee in such suit or suits."

[1] The first contention which the respondent makes in support of his refusal to audit and approve said demand is the contention that the city and county of San Francisco has, under the terms of its charter, no power to enter into a lease of privately owned real estate. We are disposed to hold that this general objection is without merit. The charter of said municipality, in article I, section 1, thereof, provides that it "may purchase, receive, hold and enjoy real and personal property." By article II, chapter 2, section 12, of said charter, the board of supervisors are given power "to purchase or acquire by condemnation such property as may be needed for public use." Certain other sections of said chapter contain provisions regulatory of the method and exercise of the foregoing powers, but we are directed

to no other article or section of said charter which undertakes to place any such limitation upon the amplitude of the foregoing powers as the respondent herein would have us impose. On the other hand, it is a general rule of interpretation applicable to charters that the broad power to "purchase, receive, hold and enjoy real and personal property" embraces and includes the lesser power to lease the same classes of property. (3 Dillon on Municipal Corporations, 5th ed., p. 1593; *Hackett* v. *Emporium Borough School Dist.,* 150 Pa. 220 [24 Atl. 627]; 28 Cyc., pp. 604, 605, and cases cited.) The succeeding contentions of the respondent go to the substance and effect of the agreement itself rather than to its own definition of its name or nature; and in this connection it may be well to refer to the language used by this court in the case of *Parke etc. Co.* v. *White River L. Co.,* 101 Cal. 37–39 [35 Pac. 442, 443], wherein, in construing the document presented in that case and which purported on its face to be a "lease," this court said:

[2] "This paper is not a lease. Calling it a lease did not establish the fact. This is peculiarly a case where there is nothing in a name, for the contents of the paper disclose its true character. It is said in *Heryford* v. *Davis,* 102 U. S. 235 [26 L. Ed. 106, see, also, Rose's U. S. Notes]. 'What, then, is the true construction of the contract? The answer to this question is not to be found in any name which the parties may have given to the instrument, not alone in any particular provision it contains disconnected from all others, but in the ruling intention of the parties gathered from all the language they have used, it is the legal effect of the whole which is to be sought for. The form of the instrument is of little account.' "

[3] It may also be said in this connection that while it is true, as was stated by this court in the case of *Egan* v. *City and County of San Francisco,* 165 Cal. 576–581 [Ann. Cas. 1915A, 754, 133 Pac. 294], "that the trend of authority in more recent years has been in the direction of permitting municipalities a wider range in undertaking to promote the public welfare or enjoyment," it is also true, as stated in the same case, that the elementary rule still obtains that "municipal corporations have only the powers expressly conferred and such as are necessarily incident to those expressly granted, or essential to the declared objects and pur-

poses of the corporation.'' (Dillon on Municipal Corporations, 5th ed., sec. 357; *Von Schmidt* v. *Widber*, 105 Cal. 151 [38 Pac. 682]; *Gassner* v. *McCarthy*, 160 Cal. 82 [116 Pac. 73].) It may also be suggested that the objects and purposes for the consummation of which the agreement under consideration has been entered into by the parties thereto are such as are embraced within the powers and functions which may be beneficially exercised by or on behalf of said municipality and its people under the conferred powers of its charter; and that the motives of those persons who, on behalf of said municipality and of said corporation, have promoted the entering into and furtherance of the agreement in question are public spirited and unselfish and are not tinctured with any suggestion of personal advantage. [4] But as this court has already said in the Egan case, ''However worthy the motive, however advantageous to the public the result sought to be attained, it must always be remembered that municipal corporations are public bodies of limited powers; and that the validity of their acts must be judged by an examination of the charter or law defining their powers rather than by a view of the purposes or results of those acts.'' Bearing in mind the foregoing principles which must govern the action of this court, we address ourselves to an interpretation of the written agreement upon the basis of which this writ is sought, for the purpose of resolving upon its real scope and effect regardless, in a certain measure, at least, of the phrases which are made use of within it purporting to define its nature. [5] The agreement is by its express terms denominated a ''lease,'' but if we are permitted to look to the stipulation of the parties to said agreement accompanying the application for this writ and made a part of its averments, the ultimate purpose of this agreement and of the activities and conduct of the parties thereunder is ''to the end that said municipality shall be entitled to acquire said lands and buildings at the actual cost thereof to said San Francisco Exposition Company.'' And even if we are to disregard said stipulation and look only to the content of the agreement itself we can arrive at no other conclusion than that the agreement in question is not a lease merely, nor a lease with an option to purchase merely; but that when read in the light of the subject to which it relates and when construed as a whole with a view

to determining the end of its creation it is nothing more
nor less than an agreement for the conditional sale of the
premises described within it to the municipality for public
uses in accordance with the terms and conditions which said
agreement contains. The agreement itself declares in the
opening recitals thereof that the purpose for which the exposi-
tion company has obtained options to purchase said lands,
and for which it intends to acquire the same, is that of con-
structing thereon a building at a cost of approximately
$1,800,000 (including the purchase price of said lands),
"such building to be suitable for the holding of agricultural
exhibits and fairs, exhibitions of horses, cattle and other
livestock, and of agricultural, viticultural, mechanical, manu-
facturing and domestic products, pageants, athletic exhibi-
tions and other exhibitions and performances *designed to
foster and stimulate* the business and welfare of the people
of the City." This recital is immediately followed by an-
other declaring that "by reason of the public nature of the
purposes for which said premises are to be used, it is de-
sirable that the same should immediately come under the
control of the city *and should ultimately be owned by it.*"
These recitals dominate the entire agreement and bind the
parties thereto to the admission that the ultimate end of
its creation is the ownership by the municipality of the lands
and premises in question and for the public uses and pur-
poses set forth therein. When we pass from the recitals of
said agreement to the covenants thereof we find that while
the instrument embodying the mutual agreements of the
parties is denominated a "lease," certain of the usual ele-
ments of a lease are lacking. For example, there is no fixed
or determinable rental for the premises, the possession of
which is to be transferred to the municipality as of the date
of said agreement. True, the municipality is to pay over to
the exposition company the sum of $100,000 as of the date
of the execution of the agreement, but it is nowhere stated
therein that this payment is being made on account of rental
or is to be so applied. On the contrary, the fact that at
the date of said agreement, which was to be also the date of
said payment, the exposition company was not the owner
of said property but had only an option to purchase the
same, coupled with the further fact that the premises were
at said date unequipped for the public uses for which it was

being taken over and that before it could be usable for such purposes extensive and costly structures were to be constructed thereon, occupying much time in their erection, would lead to the somewhat plain inference that the primary payment of $100,000 was intended by the parties to be included in the purchase of the property by the exposition company and was as to at least some portion thereof to be accounted for and applied to the ultimate purchase price to be paid by the municipality for the property in the event that it should acquire the same. The same reasoning is to be applied to the subsequent annual payments of $185,000 to be made by the municipality on the 15th of December of each and every year during the term of said agreement. These payments were not to be received by the exposition company to be applied as rental of the premises, but were to be paid to the trustee named in said agreement and to be applied by it upon account of the purchase price of the property upon the exercise by the municipality of its right to purchase the same and said aggregate sums of money were only to pass to the exposition company upon the failure of the municipality to exercise said right of purchase or to otherwise keep the covenants of said agreement to be by it performed. The same thing is true of the annual income to be derived by the municipality from the operation of the premises for the public uses to which these lands with the buildings to be erected thereon were to be applied. As to the first $30,000 of these revenues earned in each year the gross amount thereof was to be paid over by the municipality to the trustee to be held by it and applied to the eventual purchase price of the property. The net earnings annually above that sum were to be similarly applied. In a word, the exposition company, the so-called lessor of said property, was to derive no pecuniary income or advantage from the use thereof by the municipality during the term of said agreement, except in so far as the trustee was to apply such revenues to the payment of its bonds and also except as to whatever advantage might accrue to it by reason of the exercise or the failure to exercise the so-called option to purchase said property. Turning now to the advantage, if any, accruing to the municipality from the entering into and operating under said agreement. The prime advantage of a lease to a lessee is the usufruct of the premises during the term

thereof. But under this agreement the entire usufruct in the way of the annual income from the use of said property was to be paid over to the trustee to be applied upon the eventual purchase price thereof; or, in the event of the failure of the municipality to consummate such purchase, was to be utterly lost to it. Viewed from either standpoint, therefore, it is seen that those elements which are the usual concomitants of a lease are lacking from this agreement; while, on the other hand, these are the usual and consistent elements entering into agreements for the conditional sale and purchase of real property.

It is, however, claimed by the petitioners that this should not be construed to be such an agreement because the provision therein for the purchase of the premises by the municipality is expressly stated to be a mere option to purchase, which is not binding upon or enforceable against it. It is to be noted, however, that the agreement to make the several payments to be made by the municipality as a prerequisite to the exercise of the so-called "option" are not in themselves optional. As to the first of such payments the petitioners are united in insisting upon its enforcement by means of this very proceeding; while as to the annual payments of $185,000, to be made by the municipality during the period of fourteen years, the entire life of this agreement, or at least until the municipality shall exercise said option, these payments are not only made binding obligations upon the municipality, but are expressly made enforceable by actions to be brought by either the exposition company or the trustee in the event of any default on the part of the municipality in taking the necessary steps provided by its charter for the payment of these obligations. The same compulsions and the same remedies are made applicable to all of the other payments provided for in said agreement with the possible exception of the obligation on the part of the municipality to assume and pay the bonded indebtedness of the exposition company. A closer reading of this agreement will show, however, that this is an apparent and not a real exception. By the several subdivisions of section 2 of said agreement the municipality is bound, as we have seen, to make each and all of the annual and other payments provided for in the agreement to the trustee named therein. By the provisions of subdivision 3 of said agreement the said trustee is required

to apply all amounts so agreed to be paid to such trustee (with certain minor exceptions) to the payment of the first and second mortgage bonds of the exposition company and to that purpose only. With each succeeding year during the life of this agreement the voluntary or compelled payments of the obligations of the municipality thereunder accumulate in the hands of the trustee until, as the life of this agreement draws toward its close, these payments aggregate several million dollars applicable only to the redemption of said bonds whether the municipality does or does not exercise its so-called option to purchase the said property. It thus appears that while it is not expressly stated in said agreement that the municipality has obligated itself to the payment of the principal and interest of the two bond issues of the exposition company, it has bound itself to do so in effect since it is bound to pay over to said trustee the accumulating funds from which said bonds are to be paid. It also quite clearly appears that the so-called option on the part of the municipality to purchase the said property becomes in effect an increasing compulsion upon it to consummate such purchase, since not to do so would result in the irrevocable loss to the municipality not only of the primary and succeeding annual payments, which it is bound to make under this agreement, but also of the entire usufruct of the property during the period of its occupation, and also of the property itself.

[6] Sufficient has thus far been said as to the real nature and effect of this agreement, as revealed by the recitals and obligations thereof, to lead to the inevitable conclusion that it must be construed to be an agreement for the purchase by the municipality of the property described therein for public uses. Being thus interpreted we are next to consider the obstacles, if any, which the law interposes against the validity and execution of such an agreement as affecting the city and county of San Francisco. Section 18 of article XI of the state constitution provides as follows:

"No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, nor unless before

or at the time of incurring such indebtedness provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also provision to constitute a sinking fund for the payment of the principal thereof on or before maturity, which shall not exceed forty years from the time of contracting the same. . . . Any indebtedness or liability incurred contrary to this provision . . . shall be void."

"The natural and reasonable construction to be given to this language," said this court in the case of *Higgins* v. *City of San Diego*, 131 Cal. 294, 298 [63 Pac. 470, 472], "is that all legitimate indebtedness of the municipality for any year must not exceed all the revenues and income provided for that year and all indebtedness beyond such provision becomes void and cannot be paid out of the funds of the succeeding year or at all except by the assent of two-thirds of the qualified voters." In the case of *Chester* v. *Carmichael*, 187 Cal. 287 [201 Pac. 925], it was held that the liability assumed by the city of Sacramento under the facts as shown in that case to make certain expenditures of money annually for a series of years amounted to the creation of an indetedness to the extent of the aggregate of such payments as of the date when the obligation was entered into, and that the above provision of the constitution was violated thereby. In that case it appeared that certain persons, the owners of a tract of land in Sacramento suitable for park purposes, had executed to the city a conveyance of such land for said purposes upon certain covenants and conditions set forth in the conveyance and which had been formally accepted by said city. Among these was the condition that the city should annually and for a period extending over a number of years expend the sum of at least $5,000 in the improvement and maintenance of said property, such improvement to exceed in cost the sum of $50,000 in addition to the annual cost of maintenance, which was estimated as in excess of $5,000 per annum. The penalty of failure or refusal on the part of the city to make these expenditures was to be the forfeiture of its rights to said property under said conveyance and the reversion thereof to the grantors. This court held that the obligation thus imposed upon said city by said transaction amounted to the creation of a liability to the extent of the aggregate of such expenditures

as of the year and date of the conveyance, and that as such it was an indebtedness and liability created in violation of said constitutional provision. In so declaring this court cited and commented approvingly upon a number of cases from other jurisdictions having a more or less immediate bearing upon the matters involved in the present controversy. Among these was the case of *Browne* v. *City of Boston*, 179 Mass. 321 [60 N. E. 934], the facts in which case showed that the city of Boston had made an agreement with the owners of certain lands by which it agreed to purchase said lands for the sum of $226,000, paying $24,000 down and entering into an arrangement by which the owners were to place mortgages upon said lands for the sum of $202,000, payable three years after date, whereupon the city was to take said lands subject to said mortgages, with no personal liability to pay the same, but with the result that in order to retain the lands the city would be put to the compulsion of paying off the mortgages when due. The supreme court of Massachusetts held that such an arrangement was in violation of the statutory provision of that state limiting the debt liability of cities. In the case of *Voss* v. *Waterloo Water Co.*, 163 Ind. 69 [106 Am. St. Rep. 201, 2 Ann. Cas. 978, 66 L. R. A. 95, 71 N. E. 208], also cited, the facts were that the town of Waterloo, not having sufficient money to construct a waterworks and electric light plant for the town, and not being able to borrow the money necessary for such purpose without creating an indebtedness exceeding the constitutional limit, entered into an agreement with a private corporation by the terms of which the latter was to construct such electric light and water plant and issue bonds for the cost thereof, whereupon the town agreed to levy and collect annually taxes and pay the same to a trustee for the bondholders until such time as a sufficient sinking fund had been created for the payment of such bonds, the city to become eventually the owner of the plant. It was expressly provided in the agreement that there should be no liability upon the town for the payment of such bonds. The court nevertheless held that the agreement created an indebtedness beyond the limit fixed by the constitution. In the case of *Eddy Valve Co.* v. *Town of Crown Point*, 166 Ind. 613 [3 L. R. A. (N. S.) 684, 76 N. E. 537], also cited and approved, the town of Crown Point, desiring to become

the owner of a system of waterworks, entered into an agreement with a private corporation by the terms of which the latter was to construct said plant, mortgaging the same for that purpose, the town to pay annually certain rentals for the use of hydrants and of water for the inhabitants, and was to have the right at its option to purchase the plant, subject to its encumbrance, but that the town was not to otherwise assume the payment of such encumbrance. The court held that in accepting the conveyance of the property subject to the encumbrance but without any obligation to pay the same other than that imposed by the liability of a foreclosure of the mortgage, thereby depriving the town of the property, an indebtedness was created beyond the constitutional limitation. In Dillon on Municipal Corporations, fifth edition, section 199, the general rule applicable to this class of cases is thus stated:

"If the city purchases waterworks or other valuable property subject to a mortgage, the amount secured by the mortgage is indebtedness of the city even if it do not assume it or become liable for it in any way. In order to keep the property purchased the city will have to pay the mortgage, and if the amount due exceeds the limit of the debt which the city is authorized to incur, the purchase is beyond its power and void."

In the discussion of the case of *Chester* v. *Carmichael*, *supra*, the court considered the similarity of the transaction in that case to that of a purchase of lands upon the installment plan, holding that in either case, even though the only remedy of the seller for the enforcement of payment was the right of forfeiture, yet the debt was created at the time the contract was entered into for all the sums subsequently to be paid. The court also in that case distinguished it from the cases of *McBean* v. *Fresno*, 112 Cal. 160 [53 Am. St. Rep. 191, 31 L. R. A. 794, 44 Pac. 358], *Smilie* v. *Fresno*, 112 Cal. 311 [44 Pac. 556], and *Doland* v. *Clark*, 143 Cal. 176 [76 Pac. 958], by pointing out that each of the foregoing cases involved contracts for the furnishing to the city in the future of service, materials, etc., and that no indebtedness or liability within the meaning of the constitutional provision in question was incurred until the furnishing of the consideration for which the payments were to be made. The distinction between those cases and that case and also

the instant matter is obvious. The recent decision of this court in the matter of the *Controversy etc. With Boyle* (*San Francisco* v. *Boyle*), 191 Cal. 172 [215 Pac. 549], shows that matter to be within the class of cases considered in *McBean* v. *Fresno, supra,* and the other like cases cited, and hence distinguishable from the instant case. In the latter case it was held that question of the applicability of section 18 of article XI of the constitution was removed from inquiry under the stipulated facts of that case.

[7] We are unable to perceive that there is any difference as to the principles involved between the case of *Chester* v. *Carmichael, supra,* and the matter here in controversy. The only remaining inquiry is as to the applicability of the constitutional provision to the facts herein agreed upon in the state of the record before us. The petition for a writ of mandate herein is silent as to whether the creation of a liability on the part of the city and county of San Francisco to the extent of approximately $3,500,000 during the year 1924 would have the effect of causing said municipality to exceed during that year the income and revenue provided for such year. In the agreed statement of facts embodied in said petition it, however, appears that at the time of the presentation of the aforesaid claim and demand to the auditor he specified, among the several grounds of his refusal to audit and approve the same, the fact "that by said agreement said City and County of San Francisco incurs an indebtedness and liability exceeding in each of the years of the term thereof the income and revenue provided for such year without the assent of two-thirds of the qualified electors thereof voting at an election held for that purpose, in violation of section 18 of article XI of the constitution of the state of California." In the presence of this express objection to the audit and approval of said claim and demand it was, we think, incumbent upon the petitioners herein to show affirmatively, either in their petition or agreed statement of facts, that this objection was not founded in fact. This is particularly true where the municipality itself is seeking to have one of its own officials compelled to act in the approval of an expenditure from its treasury and when the state of its finances and expenditures for the year in question is peculiarly within its knowledge.

[8]   Aside from the constitutional obstacle, which seems to stand in the way of the enforcement of the agreement under review, there are also certain provisions of the charter of the city and county of San Francisco which, it is urged, deny to the city the power to acquire property or construct permanent buildings or improvements above a certain cost without submitting the matter to the vote of the people. Section 29 of article XVI of the charter provides as follows:

"When the supervisors shall determine that the public interest requires the acquisition of any land or lands, or the construction or acquisition of any permanent building or buildings, improvement or improvements, the cost of which, in addition to the other expenses of the city and county will exceed the income and revenue provided for the city and county for any one year, they must, by ordinance, submit a proposition or propositions to incur a bonded indebtedness for such purpose or purposes to the electors of the city and county at a special election to be held for that purpose only. All provisions of this charter, as the same shall read at the time of submitting such propositions to the electors, providing for the acquisition of public utilities, so far as the same are applicable, shall apply to the manner of submitting such proposition or propositions, to the issuance, character, and registration of said bonds and to the time when, and the kind of money in which said bonded indebtedness shall be payable."

Article XII of the said charter, to which the foregoing provision refers for its procedure, embraces an elaborate plan for the acquisition of public utilities, which need not be here recited but with reference to which it will suffice to say in the agreed statement of facts which are embodied in the petition for this writ it is expressly set forth, "that no election has been called nor will any be held for the purpose of authorizing the incurring by said City and County of San Francisco of the liabilities assumed by it in and by said agreement and no provision has been made and it is intended that no provision shall be made for the levy or collection by said city and county of an annual or other tax sufficient to pay the interest on said indebtedness created by said agreement nor any part thereof nor for the creation of a sinking fund for the payment of the principal of said indebtedness." This stipulation and averment

amounts to a frank avowal that the foregoing provisions of the charter relating to the acquisition of these properties for public uses are not being and are not to be complied with; and if the nature of this agreement is as we have construed it to be, and if, as we have seen, the statement of the auditor in refusing to audit and approve the present demand to the effect that said agreement has the effect of creating obligations exceeding the income and revenue of the municipality for each and every year during the term thereof, is to be taken to be true because uncontroverted, it follows inevitably that said agreement is wholly void as in violation of the express requirements of these provisions of said charter.

There are a number of other respects in which, as urged by the respondent or by *amicus curiae,* this agreement is obnoxious to the provisions of the state constitution or of the charter of said municipality and which, though fully considered, we do not deem it necessary to discuss in this opinion, having thus far based our conclusions upon what appear to be vital points involved in this controversy. There are also certain technical objections urged by the respondent against his present audit or approval of the claim and demand which form the immediate reason for seeking this writ, but which we have not considered because of the evident desire of the parties hereto that our decision should go to the ultimate question as to the validity of this agreement rather than that it should be based upon any matter that might be remedied in a later proceeding.

The application for a writ of mandate is denied.

Seawell, J., Myers, C. J., Shenk, J., Lennon, J., Waste, J., and Lawlor, J., concurred.