[Civ. No. 1722.   Fourth Appellate District.—June 6, 1935.]

VINNIE BARRY, Petitioner, v. BOARD OF DIRECTORS OF THE IMPERIAL IRRIGATION DISTRICT et al., Respondents.

Hugh S. MacKinnon for Petitioner.

Charles L. Childers, D. B. Roberts, Harry W. Horton and George R. Kirk for Respondents.

BARNARD, P. J. — This is an application for a writ of mandate compelling the respondents, as the Board of Directors of the Imperial Irrigation District, to meet and count all of the votes cast at an election held in said district on February 6, 1935.

This district was organized under the California Irrigation District Act, approved March 31, 1897, as amended. (Deering's Gen. Laws, Act 3854.) In 1915 an act was passed giving certain enlarged powers to the board of directors of irrigation districts having an area of more than 500,000 acres. (Stats. 1915, p. 1.) In 1933, the latter act was amended (Stats. 1933, p. 2028) by adding thereto two sections, which read as follows:

"Sec. 4a. In such districts, no person shall be entitled to vote at any election unless such person possesses all of the qualifications required of electors within the county election precincts in such districts under the general election laws of the State, and shall have appeared on the last preceding equalized assessment roll of the district as the holder of title or evidence of title to real property situate within the district in which the election is being held. Any holder of land under a possessory right acquired by entry or purchase from the United States or the State of California, or by a contract of purchase shall be deemed to be a holder of evidence of title to said land within the meaning of this act."

"Sec. 4b. Prior to any election in any such district, the secretary of the district shall prepare a roster of all persons

possessing the qualifications prescribed in the preceding section for each precinct or consolidated precinct within such district by reference to the last preceding equalized assessment roll of the district and the registers of voters in the county or counties in which such district may be situate, and prior to the election he shall certify to each of the election boards in the district the roster of persons qualified to vote in their respective precincts or consolidated precincts. Only persons whose names appear on such rosters shall be entitled to vote at the election for which such rosters were prepared.''

The Imperial Irrigation District has an area of more than 500,000 acres and in the election here in question, the first to be held after the adoption of the amendment last referred to, an attempt was made to apply the property qualification provisions of that amendment to the voters of said district. It is conceded by all parties hereto that the legislature may legally provide for a property qualification for electors voting at irrigation district elections, if the same applies to all districts organized under the general act, but questions are here raised with respect to the interpretation, the validity and the effect of this particular amendment of 1933.

Among other things, the petition alleges that the petitioner's term of office as assessor-collector of said district expires in March, 1935; that she was a candidate for reelection; that one Charles Bratton was also a candidate for the same office; that the secretary of said district prepared a roster of all persons possessing the qualifications required of electors under the general election laws of the state and who appeared on the last preceding equalized assessment roll of said district as the holder of title or evidence of title to real property situated within said district for each precinct within the district by reference to the last preceding equalized assessment roll of the district and the registers of voters in Imperial County; that the secretary certified to each of the election boards in said district the roster of persons qualified to vote in such precinct; that the several rosters so prepared contained, in the aggregate, the names of 5,670 electors; that on the day of the election referred to, 3,082 electors whose names were on these rosters appeared at the polls in the various precincts, were given ballots, voted the same in the usual manner, and all of said ballots were thereupon placed in

ballot boxes provided for that purpose; that 423 of the persons thus voting were given ballots on each of which an election officer, before delivering the same to the voter, had stamped the words "Cast by Special Permission" with a rubber stamp; that the names of each of the persons who were given a ballot thus marked or stamped appeared in the roster prepared and certified by the secretary of the district and each of said persons possessed all of the qualifications of a voter under the general election laws and each appeared on the last preceding equalized assessment roll of said district as the holder of title or evidence of title to real property within said district; that none of said 423 electors were challenged; that all of the ballots cast by them and thus marked were placed in the ballot boxes and mixed with other ballots cast at said election; that after the polls closed in each precinct all of the ballots which were stamped or marked as aforesaid were separated and placed in a separate envelope marked on the outside "Ballots voted by Special Permission"; that only the ballots which were not marked with the stamp "Cast by Special Permission" were counted and noted or recorded on the tally sheets; that, thereafter, the usual certificates were signed by the election officers showing the number of votes cast for each candidate but referring to and including only the votes in each precinct which were on ballots not marked "Cast by Special Permission"; that on February 11, 1935, the Board of Directors of the District met to canvass the returns of the election; that the petitioner appeared and demanded a recount of the vote in each precinct; that thereupon the board proceeded to and did recount only the ballots cast at said election which were not stamped "Cast by Special Permission" and declared the results of the election as shown by said count; that this count then showed that 1304 votes had been cast for the petitioner and 1317 votes for the said Charles Bratton for the office here in question; that the board then declared said Charles Bratton elected to said office and a certificate of election was issued to him; that at said recount the Board of Directors refused to count the 423 ballots which had been marked "Cast by Special Permission" or any of them and refused to check the signatures of the electors on the voters' roster with the rosters prepared by the secretary; that of the 423 marked ballots which were not counted, 287 votes were cast for the petitioner

and 128 votes were cast for the said Bratton; that if said marked ballots are counted there will be a total of 1591 votes for the petitioner and 1445 votes for Bratton; and that the petitioner, at the time of the recount by the board, demanded that said marked ballots be counted but the board refused to count the same. The prayer is for an order directing the respondents to meet and count all of the votes cast at said election including those referred to which were specially stamped or marked, to declare elected the person then shown to have received the highest number of votes cast for said office, and to cancel the certificate of election heretofore issued to Charles Bratton.

The answer filed by the majority of the respondent Board of Directors alleges that only 2,659 persons who had been certified by the secretary as properly qualified voters appeared and voted at said election; that in addition thereto 423 persons appeared at the polls who had not been certified as qualified voters and whose names did not appear on the roster certified by the secretary as being persons qualified to vote; that each of these 423 persons was in truth and in fact not the owner of, or the holder of title or evidence of title to, any real property within this district; that each of said 423 persons was given a ballot and permitted to designate thereon his choice of the respective candidates but that none of said 423 ballots was in any way counted or tallied or reflected in the certificates or returns made by the election officers; that if these 423 ballots were to be counted it might change the result of the election in favor of the petitioner as against the candidate declared elected by the election boards and by the Board of Directors of the District; that a recount was had before the Board of Directors of the District, at which the petitioner demanded that these 423 marked ballots be counted; that the Board of Directors refused to count the same; that at said recount the board received evidence as to the identity of the persons who had cast the 423 specially marked ballots, and as to their qualifications to vote at said election, and decided and determined that said 423 persons were not entitled to vote at said election for the reason that none of them owned any real property within the district, and refused to count said ballots because the persons casting the same had not been certified by the secretary of the

district as qualified to vote and because in truth and in fact none of them owned any real property within the district.

As an affirmative defense, the majority of the directors alleged that the 1933 amendment above referred to was passed at the request of this district and its directors; that immediately thereafter the respondent Mark Rose, together with four other individuals, conspired to circumvent and defeat the property qualification provisions therein contained; that in carrying out this conspiracy these parties executed and caused to be recorded six purported deeds each conveying a small parcel of practically worthless land to a large number of persons named as grantees therein who did not otherwise own any land within the district; that this was done with the sole intent and purpose of conveying a paper or record title to an infinitesimal parcel of land to each of said purported grantees for the purpose of giving to each of said purported grantees a purported property qualification, for the sole intent and purpose of fraudulently attempting to circumvent and defeat the intent and purpose of the property qualification provided in the amendment; that one of these deeds quitclaimed one acre to 318 grantees, another quitclaimed a vacant lot in Imperial to 421 grantees, another quitclaimed a lot in Holtville to 577 grantees, another conveyed an undivided one-half interest in ten acres to 431 grantees, another quitclaimed an undivided one-half interest in ten acres to 1156 grantees while another quitclaimed ten acres to 609 grantees; that most or all of these small parcels were worthless pieces of land which had been sold for taxes; that no consideration passed as to any of these deeds and most of the grantees named had no knowledge that they were so named therein; that in any case where the grantee had consented thereto such consent had been fraudulently given as a part of said conspiracy; that this petitioner was persuaded to join in said conspiracy and to place the names of the purported grantees in these deeds upon the assessment rolls of said district; that in so placing the said grantees on the assessment rolls of the district the petitioner did not purport to assess a separate interest to each of said grantees but purported to assess the property described in each of said deeds to all of the grantees named therein; that these answering majority members of the board and the secretary of the dis-

trict knew that the so-called conspirators would attempt to have the grantees in these deeds present themselves at the polls and demand the right to vote regardless of their actual qualifications; that solely for the purpose of keeping a record of the proposed efforts of any of said persons to vote at said election, each of said persons who appeared and requested to be allowed to vote was permitted to sign his name and give his address on a book designated as "Roster of Voters"; that a separate poll list was kept of persons actually receiving a ballot of any kind and actually marking and delivering the same to the election board; that each of the persons named as a grantee in any of said deeds who presented himself and desired to vote was permitted to sign the so-called roster of voters and was given a ballot which had stamped at the head thereof "Cast by Special Permission"; that said persons were then permitted to mark such ballots for such candidates as they saw fit, after which such ballots were received by the election board and deposited in the ballot box with all of the other ballots; that when the polls closed the election officers segregated the ballots into two piles, one containing those stamped "Cast by Special Permission" and the other those not so stamped; that said two classes of ballots were separately tallied on separate tally sheets and sealed in separate envelopes prepared for the purpose; and that when the official returns were made only those votes were counted and returned which were cast by persons who had been certified by the secretary as qualified to vote and without counting or taking into consideration the 423 ballots which had been specially marked.

The respondent Rose filed a separate answer setting up various claimed irregularities in the holding of the election; that the 1933 amendment is unconstitutional in various respects; that the secretary of the board did not carry out the provisions of that amendment; that in preparing the roster of voters provided for in section 4b of that amendment the secretary placed a star or asterisk before the names of those persons who appeared as grantees in the deeds referred to, which deeds the secretary considered to be void; that in his certificate to said rosters the secretary certified that only those persons named therein were qualified to vote where no asterisk appeared before the name on the roster; that the

certificates on the various rosters were not signed by the secretary; and that many of the ballots stamped "Cast by Special Permission" were voted by persons who had not been informed that the ballots were so stamped and who believed the ballots were in the usual regular form used by other voters.

Demurrers were filed to the petition and to the answers and while certain matters of fact have neither been admitted nor proved, as for instance the fact that the various deeds to the large numbers of grantees were given for a fraudulent purpose and are void, enough of the actual situation appears from the admitted facts for the purpose of this decision. It fully appears that in preparing the roster provided for in section 4b, the secretary did not take and certify all names appearing on the assessment rolls of the district and also appearing on the registers of voters in that county; that he included in this roster the names of many, if not all, of the persons named as grantees in the deeds above referred to; that he placed a star or asterisk opposite the names of such of these grantees as were included in the roster; that in his certificate he certified that only those before whose names no asterisk appeared were entitled to vote; that he certified to nothing with respect to those persons before whose names an asterisk appeared; that while it is admitted in the answers that the names of the persons thus marked with an asterisk on these rosters actually appeared on the assessment rolls of the district, the secretary did not certify such persons as qualified voters and it does not appear whether or not these persons were registered as voters; that the roster furnished to the election officers contained both names marked with an asterisk and not certified as qualified voters and other names not so marked but which were certified as voters; that when a person whose name was marked with an asterisk on the roster appeared at the election he was given a ballot which had been specially marked by the election board by impressing thereon with a rubber stamp the words "Cast by Special Permission"; that other persons were given ballots not so marked; that both classes of persons were allowed to go through the form of voting and all of the ballots were placed in the same boxes; and that in counting and returning the results of the election the ballots cast by those persons whose names had been marked with an asterisk on the roster and

who had been given ballots stamped in this special manner were not counted or considered.

The petitioner contends that under the provisions of sections 4a and 4b, the secretary is directed to make up the roster of voters by a reference to the assessment rolls and to the registers of voters and to nothing else; that the duty of the secretary in this regard is purely ministerial; that he must certify the entire roster thus prepared and not merely a portion of the names thereon; that this simple interpretation of sections 4a and 4b overcomes any objections to the validity of these sections, constitutional or otherwise, and makes immaterial any irregularities in the election procedure; that it must be presumed that the secretary complied with this law and any failure in this respect is an immaterial error with no resulting injury; that there was a substantial compliance with the act when the secretary prepared the list of names; that the act does not provide for placing an asterisk in front of any of the names on the list and such marks here must be disregarded; that while there were certain irregularities in this election, these consisted of violations of directory, as distinguished from mandatory, provisions of the law; that while the marking of certain of these ballots by the election board was unauthorized by law, the same was a minor and unsubstantial variation from the law and must be disregarded; that since the 423 ballots in question were cast by persons who were actually entitled to vote, any irregularity in the holding of the election is immaterial; and that nothing remains to be done except to count the specially marked ballots which the election boards and the Board of Directors refused to consider.

The respondent majority of the board contend that the persons who cast the 423 ballots in question were not certified by the secretary as qualified to vote; that in fact they were not owners of property in the district and were not so qualified; that their names were included on the assessment rolls of the district as the result of a conspiracy and by reason of fraudulent deeds to worthless lands; that it was not possible to challenge such voters because the situation was not within the grounds of challenge provided in section 1230 of the Political Code; that it was not possible to purge the lists of these names since it was impracticable to serve all of the grantees in these deeds; that it was therefore decided to keep

track not of individual ballots but of the ballots cast by a certain class, namely, the grantees in these purported deeds; that the only provision in the general election laws against marking a ballot is that a ballot must not be marked by a voter in such a manner that it can be identified; that under the general election laws the marking of ballots by the election board with a stamp is not unlawful; that marking the ballots in this manner would and did enable the two classes of voters to be segregated; that it was known that any refusal to permit the grantees in these deeds to vote would be attacked as illegal; that it was therefore decided to permit them to cast a special ballot and leave their right to vote and the counting of such votes to the proper tribunal if a hearing should be asked; that the secretary prepared a roster of the names found on the assessment rolls and also on the register of voters but placed a star opposite the names of the grantees in these particular deeds and thus enabled the election officers to identify them and to give them a specially marked ballot; that the secretary did not certify the grantees in these deeds as having the proper qualification and in the certificates distinguished between them and others who had an unquestionable right to vote; that the election boards had been provided with ballots in the proper form as required by law, all duly numbered; that these ballots had been provided with a space at the top where they could be stamped "Cast by Special Permission" with a rubber stamp; that the election boards had the lists of names with certain names marked with an asterisk so that they could tell which persons should be given a specially marked ballot; that the election boards were instructed to give such specially marked ballot to all persons whose names on the lists were marked with an asterisk; that after the polls closed both classes of votes were counted but, under instructions given to the election boards, the results were declared from a count of the unstamped ballots only; that while there is no definite statutory authority for this procedure it violates no mandatory or directory provision of any election law; and that this procedure preserved the record so that anyone casting such a marked ballot and who claimed a right to vote could later establish such right in a proper proceeding. It is then argued that there is no provision of law permitting a contest in an election in an irrigation district, that the only recourse in such a case is by de-

manding a recount by the Board of Directors of the District, that such a recount was demanded and had, that the action of the board upon this recount is final and conclusive and cannot be reviewed in the courts, and that, therefore, no writ can issue herein.

The respondent Rose contends that this entire election is void because sections 4a and 4b are unconstitutional in that they are local and special laws where general laws can be made applicable, that they do not have a uniform operation, that they grant special privileges or immunities to an arbitrary class of persons selected from a larger body of persons standing in the same relationship to the subject matter, that they unlawfully delegate legislative and judicial powers, and further that these sections are void because they cannot be construed in such a manner as to make it possible to comply with the terms thereof.

■ With reference to the contention that these sections violate article IV, section 25, of the Constitution, in that they constitute local and special laws where general laws can be made applicable and that they violate article I, section 11, of the Constitution in that they do not have a uniform operation, it may be observed that there is some support for the view that these amendments are not unconstitutional for these reasons and that it is within the power of the legislature to provide for a property qualification for voters in elections in irrigation districts of this size. Larger districts may have a larger population, bringing about different and greater problems, a fact which is recognized by permitting cities to be classified according to their population for many purposes. There may be a considerable difference between larger districts which are more apt to contain large bodies of land which are farmed by tenant farmers or employees and in which there are a number of towns and cities, some of them of considerable size, and smaller districts with fewer nonresident owners and composed entirely or largely of small farms operated by their owners. We must presume that the legislature took evidence as to such matters and others that might be mentioned and we could not arbitrarily hold that there was no natural or reasonable ground for such a distinction in the absence of a more complete showing as to the facts than we have here. In *Wores* v. *Imperial Irr. Dist.*, 193 Cal. 609 [227 Pac. 181], in considering the act of 1915, prior to these

amendments of 1933, it was held that there was a proper ground for the classification in so far as the act then stood. As then considered, the act related to giving an increased power to the board of directors in districts containing more than 500,000 acres, particularly with respect to making assessments. Many facts are set forth in the opinion in that case as justifying the classification there made for the purposes then under consideration. It might well be argued that grounds sufficient to justify such a classification for the purpose of giving an increased power to levy assessments would also justify applying a different method of electing the men who are to exercise this enlarged power. The legislature has broad powers and may exercise a wide discretion in providing for and controlling the manner in which the affairs of an irrigation district shall be carried on. (Const., art. XI, sec. 13; *In re Madera Irr. Dist.*, 92 Cal. 296 [28 Pac. 272, 27 Am. St. Rep. 106, 14 L. R. A. 755].) However, in view of other considerations, it is not necessary to decide the question thus raised.

The objection that these amendments provide for an unlawful delegation of legislative and judicial power and discretion, might apply under some interpretations thereof. If they are to be construed, as they were by the Board of Directors in this district in this election, as permitting or authorizing the secretary of the district to decide and determine not only which of the names on the assessment roll appeared there as the holders of title or evidence of title to land in the district, but also that an evidence of title so held was in fact void and worthless, and this without notice or hearing of any kind and without any opportunity to such holder of title to appear and defend the same, it must be held that the act confers judicial powers on a subordinate appointive officer of the district and that the same is unconstitutional. On the other hand, if these amendments mean that the secretary is merely authorized to make up the rosters for the election by placing thereon the names of persons whose names appear both on the assessment roll of the district and on the register of voters, the amendments would not be subject to this objection.

What, then, is the proper interpretation of these sections or can their real meaning be understood and determined? This brings us to what we consider the most important objec-

tion to them, namely, that they are so vague and indefinite that it is impossible to tell what they mean or to give to them a reasonable and sensible interpretation. As was said in *In re Leach,* 215 Cal. 536 [12 Pac. (2d) 3]: "It is not necessary to cite authorities in support of the proposition that when a statute is so vague and uncertain that a person of ordinary intelligence cannot understand its meaning, it may not be upheld as a valid statute, . . . " See, also, *In re Peppers,* 189 Cal. 682 [209 Pac. 896], *In re Schmolke,* 199 Cal. 42 [248 Pac. 244], and *County of Tulare* v. *City of Dinuba,* 188 Cal. 664 [206 Pac. 983]. It is first apparent that the act here in question cannot be literally complied with. It provides that no person shall be entitled to vote at such an election unless he shall have appeared on the last assessment roll of the district as the holder of title or evidence of title to real property within the district. Section 35 of the Irrigation District Act governs the preparation of these assessment rolls and provides that the assessor must assess all land in the district to the persons who own, claim or have possession or control thereof. That section then provides what must appear on the assessment roll or assessment book, including the name of the person to whom the property is assessed, with a provision that if the name is not known to the assessor the property shall be assessed to "unknown owners". The assessment may have been made to the person claiming or having possession or control of a particular property, or even to an unknown owner, and it is nowhere provided that the assessment rolls shall show which names thereon are there as the holders of title or evidence of title to real property within the district. We think the amendments are vague and uncertain in that it cannot be told therefrom who is to be allowed to vote, whether all of those who in addition to being on the register of voters also appear on the assessment rolls, or only such part of these persons as affirmatively appear on the face of the assessment rolls to be there as holders of title, or such part plus any others who may appear from an outside investigation to have been placed upon the assessment rolls because they were holders of title. If the purpose was to permit someone to decide who is the holder of title, this involves either an unusual discretion on the part of the assessor in making up the assessment roll or upon the part of the secretary in making up the roster of

voters. In either case, an attempt to comply therewith would involve not only the use of discretion but even of judicial power which could not be delegated to such an officer. It would open the door to great possibilities of fraud and discrimination in permitting either of such officers to exercise such a power of passing upon the validity and effect of various instruments affecting the title to land but, more important, so far as the present consideration is concerned, the provisions of the act are so vague, indefinite and uncertain that it cannot be determined what shall be done or how it shall be done. After the assessor has prepared the assessment rolls in accordance with the other provisions of the irrigation act, it cannot be told from the provisions of this amendment what the secretary is to do in preparing the roster of voters, whether he is merely to take the names from the assessment roll or to supplement that as the result of his own outside investigations, or if so, how this shall be done. If the secretary is to go outside of the assessment roll no rules whatever are laid down for his guidance.

The act is also inconsistent in its express provisions. Section 4a, as one qualification for a voter, provides that he shall have appeared on the last assessment roll as the holder of title or evidence of title to real property in the district. Not only would this naturally involve and require an outside investigation as to whether those named on the roll appeared there as the holders of title or evidence of title, since that fact would not appear on the face of the assessment roll, but that section goes on to specifically provide that persons claiming under entry or purchase from the federal or state governments, or by contract of purchase from others, shall be deemed holders of title within the meaning of the act. This plainly indicates an intention that an investigation is to be made into the actual facts and that the status of those appearing on the assessment rolls is to be investigated to the extent and to the end of determining whether they are, in fact, holders of title or evidences of title, it being even provided that certain forms of claim to property shall be deemed to be evidence of title. On the other hand, section 4b provides that the secretary of the district shall prepare a roster of all persons possessing the qualifications prescribed in section 4a and that he shall do this "by reference to the last preceding equalized assessment roll of the district and the registers of voters in

the county''. No one can literally comply with both of these sections and an attempt to comply with either, in disregard of the other, or to apply the workable portions of both, not only leads to difficulties obviously not intended by the legislature, but results in something entirely different from that which is authorized by either section. We think these two sections, constituting the amendment of 1933 to the act of 1915, are so vague, uncertain and inconsistent that their meaning cannot be understood and that it is impossible to give them a reasonable or sensible construction.

██ It further appears that in this particular case neither this amendment of 1933 nor the other election laws were complied with. Whatever this amendment means and if it can be interpreted as having a reasonable meaning, it cannot possibly be held that, under its provisions, the secretary of an irrigation district had the power, after determining that certain persons appeared on the assessment roll of the district and also on the register of voters of the county, to arbitrarily determine and decide that the deeds under which these persons claimed were void and in fact conveyed no title and that said persons had no right to vote for that reason. In any event and whatever be the meaning of this amendment, the secretary did not comply with the same in making this roster of voters. He prepared a list containing the names of persons named as grantees in these deeds and a large number of other names. He marked the names of these· particular grantees with a star or asterisk and attached his certificate that the persons whose names were so marked were not qualified to vote, and that the other persons named were qualified. If these other persons were not qualified to vote their names should not have been included in such a list. And we have no way of knowing whether or not the 423 voters whose votes we are asked to order counted were otherwise qualified or not. They were not certified as voters and it does not appear whether or not their names were on the registers of voters in that county.

██ Section 23 of the Irrigation District Act provides that elections in irrigation districts shall be conducted as nearly as practicable in accordance with the general election laws of the state. This provision was not followed in the election here in question. Under instructions given to them by the Board of Directors of this District the election officers

permitted these 423 persons, although they had not been certified by the secretary as qualified to vote, to receive and cast ballots. They gave these persons specially marked ballots and then after the polls were closed segregated these ballots and refused to count or consider the ballots so specially marked. The respondent board argues that the only provision in the general election laws which forbids any special mark on the ballot is the provision which forbids a voter from so marking his ballot as to enable him later to identify it. But section 1197 of the Political Code provides that but one form of ballot shall be used at an election. Subdivision 7 of that section provides that all of the ballots shall be precisely of the same size, arrangement, quality and tint of paper, kind of type, and printed with the same kind of ink so that without the numbers on the stubs it shall be impossible to distinguish one of· the ballots from the others. The stamping of these ballots with a rubber stamp reading ''Cast by Special Permission'' was a direct violation of this section of the code, and was both unauthorized and illegal. Such a system of marking and discarding certain ballots violates the spirit of any and all election laws, and if permitted and approved would open the door to all manner of fraud. Whether or not this violation of law, standing alone, would constitute a sufficient ground to set aside an election, it here furnishes an additional reason for so doing.

If these deeds with the many grantees named therein were, in fact, fraudulent and if such grantees were not authorized to vote, those facts should have been determined in advance in an action to purge the rolls or by challenge or in some other proper procedure and not by going through the pretense of allowing these persons to vote, marking their ballots and refusing to count the same. We are not impressed by the argument of the respondent majority of the board that because they believed the six deeds were recorded to carry out a fraudulent conspiracy to avoid the effect of the amendment in question, the course adopted by them was the only one open to them after the Supreme Court decided that election rolls could not be purged without personal service on the persons involved (see *Pierce* v. *Superior Court*, 1 Cal. (2d) 759 [37 Pac. (2d) 453]) since the number of these grantees was so great as to make personal service on them impracticable. The deeds were recorded nearly a year before

the election was held and any difficulty involved or even the existence of a fraudulent conspiracy, if such be a fact, would not justify further illegal acts on the other side. Regardless of the situation as it appeared to these members of the board, and regardless of their good intentions in the matter, the fact remains that the procedure adopted only made the matter worse and added new difficulties to an already perplexing problem.

■ Because we think this amendment of 1933 is void as so vague, uncertain and inconsistent that its meaning cannot be determined and because neither this amendment nor the other laws relating to elections were complied with, we are compelled to hold that the purported election of February 6, 1935, is void. It would be an idle act to order the questioned votes counted, under these circumstances. (*Page* v. *Board of Supervisors,* 85 Cal. 50 [24 Pac. 607]; *Wilson* v. *Blake,* 169 Cal. 449 [147 Pac. 129, Ann. Cas. 1916D, 205].)

■ As a part of the relief demanded the petitioner asked that the respondent board be directed to cancel the certificate of election issued to Charles Bratton, and this was included in the alternative writ. Under the general rule, a peremptory writ follows the terms of the alternative writ and should be denied when the complete relief asked for cannot be given. (*Gay* v. *Torrance,* 145 Cal. 144 [78 Pac. 540].) While this rule may be departed from in a proper case (*Larkin* v. *Superior Court,* 171 Cal. 719 [154 Pac. 841, Ann. Cas. 1917D, 670]) the circumstances do not warrant such an exception here. To order this certificate cancelled would do the petitioner no good, the holder of the same is not a party to this proceeding, and it seems best to deny the application for a writ in its entirety.

The petition for a writ of mandate is denied.

Marks, J., and Jennings, J., concurred.

An application by petitioner to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 5, 1935.