[No. 15160. In Bank.—December 21, 1894.]

## A. W. VON SCHMIDT, RESPONDENT, *v.* JAMES H. WIDBER, TREASURER, ETC., APPELLANT.

MUNICIPAL CORPORATIONS — PURCHASE OF SITE FOR SMALLPOX HOSPITAL — POWER OF SUPERVISORS OF SAN FRANCISCO.—The board of supervisors of the city and county of San Francisco have no authority, under the terms of the Consolidation Act, to purchase real estate as a site for a smallpox hospital.

ID.—REFUSAL OF TREASURER TO PAY DEMAND.—The action of the treasurer of the city and county of San Francisco in refusing to pay a demand for the purchase price of a site for a smallpox hospital is in the exercise of authority conferred upon the treasurer by the terms of the Consolidation Act.

ID.—POWERS OF MUNICIPAL CORPORATIONS.—A municipal corporation can exercise no powers except those which are granted in express words, or those necessarily or fairly implied in or incident to the powers expressly granted, or those indispensable to the declared objects and purposes of the corporation; and any reasonable doubt concerning the existence of the power is to be resolved against the municipal corporation.

ID.—AUTHORITY OF MUNICIPAL OFFICERS.—Powers of a municipality are to be exercised through its legally constituted agents, and the authority of each officer, board, or department to exercise any of the corporate power with which the municipality has been clothed must be distinctly conferred upon that officer, board, or department, or its act will create no obligation against the municipality.

APPEAL from an order of the Superior Court of the City and County of San Francisco denying a new trial.

The facts are stated in the opinion of the court.

*Harry T. Creswell,* for Appellant.

*Tilden & Tilden,* for Respondent.

HARRISON, J.—In September, 1890, respondent made an offer in writing to the board of supervisors of the city and county of San Francisco to sell to the city certain real property therein, known as Shag Rock, for the sum of fifteen thousand dollars. The communication was referred by the board of supervisors to the committee on health and police, and on the 2d of December, 1890, that committee reported in favor of the purchase, and its report was adopted by the board of supervisors. December 9, 1890, the board of supervisors adopted a resolution authorizing the committee on health and police to purchase the property on behalf of the city and county, for the sum of fifteen thousand dollars, as a site for a smallpox hospital; the title to the said property to be first passed upon by the city and county attorney, and, if found perfect, then such purchase to be made. January 2, 1891, the city and county attorney gave to the committee his opinion that the title thereto was in the respondent, Von Schmidt, and on the same day Von Schmidt executed an instrument sufficient in form, and purporting to convey the property to the city and county of San Francisco, and delivered it to the chairman of the committee on health and police. At the meeting of the board of supervisors in the evening of that day the chairman of that committee presented the deed, and upon his motion the clerk was directed to "hold said deed in escrow until the consideration therefor had been duly allowed." At the same meeting of the board of supervisors a warrant or demand for the sum of fifteen thousand dollars in favor of Von Schmidt was presented, and upon the approval of the auditing committee to which it had

been referred by said board, was allowed and ordered paid, and on the following day, after having been duly audited by the auditor, was presented to the treasurer for payment, and was by that officer registered, but was not paid. January 5, 1891, the board of supervisors passed a resolution purporting to repeal its action in allowing and ordering the payment of the demand, and in authorizing the purchase of the property, and directing the treasurer not to pay the said demand, and also to cause the cancellation of its registration upon its books; and also directing the auditor to cancel all action in his office whereby the said demand had been audited; and the clerk of the board was directed to return to Von Schmidt his deed of conveyance. Under these resolutions entries were made on the books of the auditor and of the treasurer canceling their previous action in reference to the demand, and the clerk returned the deed, but Von Schmidt declined to receive it, and returned it to the custody of the clerk. January 6, 1891, Von Schmidt again presented the demand to the defendant as treasurer, and demanded payment, which was refused; and on the 12th of January made application to the superior court for a writ of mandate directing the payment of the demand. Upon the hearing by that court judgment was rendered in favor of the petitioner. A motion for a new trial was made on behalf of the defendant and denied, and from this order the defendant has appealed.

The delivery of the deed by Von Schmidt to the chairman of the committee on health and police was sufficient on his part as a delivery to the city. That committee had been authorized by the board of supervisors to make the purchase, and to that extent was the agent of the city to whom the delivery might be made, and the action of the supervisors in directing the clerk to hold the deed until the consideration therefor had been duly "allowed" was in accord with the purpose of Von Schmidt in delivering it to the chairman that it might be delivered to the city when the warrant was issued. The term "escrow" in the direction to the clerk

had no technical significance, and did not change the character of the instrument or of its delivery, but was used in the same sense in which Von Schmidt stated that the delivery was made, viz: "If I received the warrant the sale was complete, and if not I was to have the deed back." It was the ordinary case in which the delivery of the deed is to be made simultaneously with the payment of the purchase money; the mere act of the grantor in placing the deed in the hands of the grantee, without an intention thereby of parting with the control of the deed, does not render the delivery complete unless the purchase money is paid. The subsequent approval by the board of Von Schmidt's demand for the purchase money, and issuance to him of the warrant therefor, completed an acceptance of the deed by the city; and, if the board of supervisors had the power to make the purchase, the transaction would have been complete, and his title to the land transferred to and vested in the city; and his right to the purchase money would also have been complete. In *Laforge* v. *Magee*, 6 Cal. 650, it was held that when the holder of a county warrant had presented it for payment at a time when there was money in the treasury which had been appropriated for that purpose, his right to the money became fixed, and could not be destroyed by a subsequent legislative enactment. The subsequent action of the board of supervisors, purporting to repeal its allowance of the petitioner's claim, could not divest him of his right to the money. (*McConoughey* v. *Jackson*, 101 Cal. 265; 40 Am. St. Rep. 53.)

The writ of mandate is issued to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station (Code Civ. Proc., sec. 1085); and, unless there is some duty enjoined by law upon the defendant to pay the claim of the petitioner, the writ ought not to issue. Section 82 of the act incorporating the city and county of San Francisco, commonly known as the Consolidation Act (Stats. 1856, p. 189), declares: "No payment can be

made from the treasury or out of the public funds of
said city and county unless the same be specifically
authorized by this act, nor unless the demand which is
paid be duly audited as in this act provided, and that
must appear from the face of it." Section 84 of the
same act also provides that, before any demand upon the
treasury can be paid, it must be presented to the auditor
and allowed, and further declares that " the allowance
or approval of the auditor or board of supervisors, or
any other board or officer, of any demand which, upon
the face of it, appears not to have been expressly made
by law payable out of the treasury or fund to be charged
therewith, shall afford no warrant to the treasurer or
other disbursing officer for paying the same"; and in
section 86, as amended in 1857 (Stats. 1857, p. 217),
it is provided that " every officer who shall approve,
allow, or pay any demand on the treasury not author-
ized by this act, shall be liable to the city and county
individually, and on his official bond for the amount of
the demand so illegally approved, allowed, or paid."
Section 95 of the act, as amended in 1857 (Stats. 1857,
p. 218), limits the objects for which the public moneys
may be expended by declaring that " payments of de-
mands on the treasury of said city and county may be
made for the following objects, *and none others*"; and,
after enumerating these objects, provides in the fifteenth
subdivision that " expenditures previously authorized
by the board of supervisors, *in the lawful exercise of their
powers*, for objects other than those specified in the pre-
ceding fourteen subdivisions of this section may be paid
out of the surplus fund as specified in sections 97 and
98, but not otherwise." Acts giving additional author-
ity for some special expenditure of public moneys have
been passed by the legislature from time to time, but
the restrictions placed upon the payment of moneys out
of the treasury in the original act have never been
modified. From these provisions it appears that it is
the duty of the treasurer to examine every claim pre-
sented to him for payment. and that the mere fact that

the claim has been allowed by the supervisors or approved by the auditor does not of necessity impose upon him the duty to pay it. He is charged with a knowledge of the objects for which the public moneys in his custody may be expended; and, if a demand is presented to him which on its face appears to be for a claim not authorized by law, or for an expenditure which was beyond the power of the supervisors to incur, he is required to refuse such payment.

Upon the face of the demand presented to the treasurer by the petitioner herein it appears that it was for the payment for certain real property purchased from him by the board of supervisors in behalf of the city and county "as a site for a smallpox hospital," and the treasurer was required to determine whether such purpose was within the power of the board of supervisors. If the board of supervisors had the authority to make this purchase it was his duty to pay the demand, whereas, if they did not have such authority, he was justified in refusing to pay it.

The validity of Von Schmidt's title to the land purchased cannot be inquired into in this proceeding. The condition in the resolution for its purchase, that the purchase should be made if the title was found perfect, was addressed to the committee, and was to be determined upon the examination and report upon the title by the city and county attorney; and his subsequent opinion that the title was in Von Schmidt was not open for revision by the treasurer. The treasurer is not authorized to review the action of the board of supervisors in any matter within their power upon which they have exercised their legislative judgment or discretion. He is not justified in refusing the payment of any demand for an expenditure which the board of supervisors is authorized to make, and which it has allowed and ordered paid. It is only when it directs the payment of an expenditure which it has no power to incur that the treasurer is justified in refusing to make the payment.

The rule is so familiar as to be trite that a municipal corporation can exercise only such powers as have been conferred upon it in its charter, or by some general law, and that any person in dealing with it is charged with a knowledge of every limitation upon its power to contract a liability. This rule is not, however, to be so considered as to require an authority in express terms for the performance of every municipal act. If an express power to accomplish some result has been conferred it will carry with it the authority to do such subsidiary acts as are incidental and necessary to the exercise of that power. The rule, as stated by Mr. Dillon (1 Dillon on Municipal Corporations, 4th ed., sec. 89), and approved in various authorities, is that " it is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers and no others: 1. Those granted in express words; 2. Those necessarily or fairly implied in or incident to the powers expressly granted; 3. Those essential to the declared objects and purposes of the corporation—*not simply convenient, but indispensable.* Any fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation; and the power is denied." And in section 91 the same author says: " The rule of strict construction of corporate powers is applicable to grants of powers to municipal and public bodies, which are out of the usual range, or which may result in public burdens, or which in their exercise touch the right to liberty or property, or, as it may be compendiously expressed, any common-law right of the citizen or inhabitant." There is a marked distinction between the incidental powers that are implied in favor of the acts of a business corporation and those of a municipal corporation. The inability of a business corporation to avoid its obligation upon the plea of *ultra vires,* when it has received and retained the consideration for its obligation, has no application to a municipal corporation. The former is organized for the profit of its

members, and its executed acts in purported further-
ance of that object, unless restrained by its charter, or
prohibited by positive law, will be upheld; whereas
municipal corporations are organized for governmental
purposes, and invested with a portion of the authority
which properly appertains to the sovereign power of
the state, and can exercise only such powers as are
expressly conferred or necessarily implied.   As the
power of raising money by taxation is conferred for the
purpose of defraying the public expenditures, and is to
be exercised only for the purpose of meeting such ex-
penditures, the limitation upon this power is effected
by limiting the objects for which the moneys may be
expended.   This power of taxation is one of the highest
attributes of sovereignty, and, as a municipality seeking
to exercise it must find express authority from the legis-
lature, so its power to disburse the public moneys, being
correlative to the power of taxation, must equally find
express authority for its exercise.   The purchase of real
estate, by itself considered, is not the exercise of any
governmental function, and such purchase by a munic-
ipality can be sustained only by the production of an
express authority from the legislature therefor, or upon
its being shown that it is necessarily incidental to the
exercise of some express function of government with
which the municipality is charged.

It is conceded in the brief on behalf of the respond-
ent that there is no statutory provision which in so
many words states that the city and county of San
Francisco shall have the power to purchase a site for a
smallpox hospital; but it is contended by him that such
power is inherent in a municipal corporation, and neces-
sarily incident to the powers already granted, and to
the discharge of its governmental functions; and in
support of this proposition he cites certain provisions
of the Consolidation Act, and certain statutes subse-
quently enacted.

The provision in section 1 of the Consolidation Act
that the corporation then known as the city of San

Francisco should remain and continue to be a body politic and corporate by the name of the city and county of San Francisco, and declaring that by that name it "may purchase, receive, hold, and enjoy real and personal property, and sell, convey, mortgage and dispose of the same for the common benefit," is to be considered not as a grant of unlimited power to do the acts therein enumerated, but merely as declaratory of the corporate capacity and power of the body politic to be exercised in the mode, and under the limitations subsequently provided in the act. The powers of a municipality are to be exercised through its legally constituted agents—its officers, boards, or departments—and the authority of each officer, board, or department to exercise any of the corporate power with which the municipality has been clothed must be distinctly conferred upon that officer, board, or department, or its act will create no obligation against the municipality. As the obligation sought to be enforced in the present case is claimed to arise solely from the acts of the board of supervisors, only the powers of that board to create the obligation need to be considered. The powers of this board, as conferred by the original act of incorporation, are contained in article V, sections 64–74 of the act, and in section 67, it is declared : " The powers of the board of supervisors are those granted in this act, and they are prohibited to exercise any others." Other statutes conferring additional and specific powers upon the board have been enacted by the legislature from time to time, and these statutes have been held to be in the nature of amendments to and to form a part of the charter of the city and county. By the act of April 4, 1863 (Stats. 1863, p. 168), the board of supervisors were authorized "to allow and order paid out of the general fund, not to exceed the sum of six thousand dollars for any one year, for the support of the smallpox hospital of said city and county." The authority to purchase land " as a site for a smallpox hospital" cannot be implied from the power con-

ferred upon the board of supervisors by this statute. Aside from the fact that this statute makes no mention of real estate, or of any purchase thereof, its language limits the power to the expenditure of " six thousand dollars for any one year," and the money thus allowed to be expended is for the "support" of *the* smallpox hospital—words which eminently refer to an existing hospital, rather than to one to be thereafter brought into existence.    It is not to be inferred that when the legislature was thus careful in limiting the amount of money to be expended, and in the language in which it described the mode of its expenditure, it intended to confer an unlimited authority upon the board of supervisors to expend any amount of money that it might choose for the purchase of a site for the hospital for whose support it had thus provided.    The provision in the twentieth subdivision of section 74 of the Consolidation Act, as amended in 1861 (Stats. 1861, p. 552), giving to the board of supervisors power " to provide for the care and maintenance of the indigent sick of said city and county, but not to incur any expense therefor exceeding the sum of three thousand dollars a month," is subject to the same observation, and the expenditure thus authorized is particularly provided for in the thirteenth subdivision of section 95 (Stats. 1857, p. 219), which directs its payment as follows: " Out of the general fund bills duly audited for expenditures in the care and maintenance of the indigent sick of the city and county, previously authorized by the board of supervisors, and not exceeding the amount in this act limited for that purpose."    The " indigent sick " is a class distinct from that to be cared for in the smallpox hospital, and the subsequent act in 1863, by which additional power was given to the supervisors to allow "six thousand  dollars for any one year" for the support of the smallpox hospital, shows that this provision had no connection with the provision in the original act for the support of the indigent sick.    Further confirmation

of this construction of the provision in section 74 is found in the act of 1865 (Stats. 1865, p. 214), by which, when the city desired to build an almshouse and hospital, express authority was granted by the legislature, either to set apart land belonging to the city, or to purchase land therefor, if the land owned by the city was not suitable. Nor did the board of supervisors derive authority to purchase the land in question from the power given by the act of April 25, 1863 (Stats. 1863, p. 540), "to make all regulations which may be necessary or expedient for the preservation of the public health and the prevention of contagious diseases"; or from the provisions in section 11 of article XI of the constitution, giving authority to the city "to make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws." The "regulations" which the board of supervisors is thus authorized to make are rules of conduct to be observed by the citizens, and cannot by any construction of language be held to include the purchase of real estate; nor can the power to make such purchase be implied from the authority to make the regulations. (*Ketchum* v. *Buffalo*, 14 N. Y. 360.)

We are of the opinion that in none of these statutes has the legislature conferred upon the city and county of San Francisco the authority to purchase any real estate as a site for a smallpox hospital, and, consequently, that the board of supervisors had no authority to make the purchase of real estate for which the demand was given to the petitioner; and that the action of the treasurer in refusing to pay the demand was in the exercise of an authority conferred upon him by the terms of the Consolidation Act.

The order denying a new trial is reversed, and a new trial ordered.

Garoutte, J., Fitzgerald, J., McFarland, J., and De Haven, J , concurred.