[Civ. No. 22288. First Dist., Div. One. Jan. 7, 1965.]

CITY OF REDWOOD CITY, Petitioner, v. HELEN C. MOORE, as City Clerk, etc., Respondent.

564

Robert J. Costello, City Attorney, and Richard E. Gardella, Assistant City Attorney, for Petitioner.

Nathan D. Rowley, Thomas R. Shearer, Jr., and Orrick, Dahlquist, Herrington & Sutcliffe for Respondent.

MOLINARI, J.—This is a proceeding in mandamus brought by the City of Redwood City to compel its city clerk, respondent herein, to cause the printing of certain "Reclamation Bonds" and certain "Facilities Bonds" in the aggregate principal amount of $5,000,000. Respondent has refused to proceed with such printing on the ground that she has been advised by counsel that the issuance of said bonds may be unwarranted by law. An alternative writ of mandate was issued by this court, and we now proceed upon the order to show cause thereon to determine whether a peremptory writ should be granted directing respondent to cause the printing of said bonds.

### THE FACTS

The chronological background of these proceedings is as follows: On March 9, 1964, the City Council of the City of Redwood City, a municipal corporation (hereinafter referred

to as "the Council"), adopted Ordinance No. 1128 known as the "Redwood City General Improvement District Ordinance" (hereinafter referred to as "the ordinance"), which provided for the formation of general improvement districts within the City of Redwood City (hereinafter referred to as "the City"); for the adoption of improvement projects in said districts; for the financing of such projects through the issuance of bonds; and for the Council to be the governing body of any district formed pursuant to the ordinance. Pursuant to this ordinance, the Council, on April 13, 1964, passed Resolution No. 4255 which determined that public interest and convenience required the formation of a proposed general improvement district to be known as "Redwood City General Improvement District No. 1-64" (hereinafter referred to as "the District"), provided for five separate projects for said District,[1] and stated that the gross estimated cost of said projects was the sum of $168,000,000. The resolution also provided the time and place for the hearing of objections by persons interested in the formation of the proposed District, in the lands to be included therein, or the proposed projects. Thereafter, on May 4, 1964, the hearing provided for in said resolution was held, no written or oral objections were presented, and the Council thereupon passed Resolution No. 4274 determining that public interest and convenience required the five projects and the formation of the District, and established the District and fixed its boundaries. On the same day the Council passed Resolution No. 4277 providing that it was its intention that the District incur a general bonded indebtedness in specified amounts for each of said projects,[2] and fixing a time and place for the hearing of the questions

[1]The five projects, which for brevity shall hereinafter sometimes be referred to by the capital letters opposite thereto, were designated as follows:

A: Reclamation and drainage on the shore of San Francisco Bay, including filling, excavation of waterways, levees, a drainage system including pumping and discharge facilities, and water level control structures.

B: Streets and highways, including expressways, interchanges, curbs, sidewalks, lighting, traffic controls, and landscaping.

C: Sewerage treatment facilities, including transmission lines, treatment plant and pumping stations.

D: Water mains, reservoirs and pumping plants, to connect with facilities of the San Francisco Water Department.

E: Parks and recreation facilities including waterways, community and neighborhood parks, greenbelts, public beach, public boating facilities, and a golf course.

[2]Project A, $70,168,000; Project B, $63,445,000; Project C, $21,226,-000; Project D, $17,094,000; Project E, $4,462,000.

whether the whole District would be benefited and whether the tax basis for such projects should be land only, or real property, or all taxable property. On May 25, 1964, the hearing provided for in the last mentioned resolution was held and three persons, none of whom were property owners in the District, appeared and made oral objections. At the conclusion of the hearing the Council adopted Resolution No. 4298 determining that the public interest and convenience required the incurring of the aforementioned bonded indebtedness for the five projects; that the whole of the District would be benefited by each of said projects; and that the tax base for Project A (Reclamation and Drainage Project) should be land only, and that for the other projects, real property. Following the passage of Resolution No. 4298, and on the same day, the Council adopted Resolution No. 4299 providing for the calling of a general obligation election on June 16, 1964 for the purpose of submitting to the voters of the District five measures for incurring the said bonded indebtedness for the five projects. This resolution provided that because the District was uninhabited and had no registered electors residing within its boundaries, the voters entitled to vote at said bond election should be ''owners'' as that term was defined in the ordinance.

The District covers 4,382 acres, and, as disclosed by the tax records, Leslie Salt Co., a corporation, was the sole owner of all the lands in the District. Accordingly, notice of the passage of the aforesaid resolutions was only given to said corporation. A portion of said lands had, however, on April 6, 1964, been conveyed by unrecorded deed to Leslie Properties, Inc., a corporation. On June 4, 1964, and prior to the holding of the bond election, both corporations executed a ''Waiver of Notice'' whereby they expressly waived any and all notice of the Council hearings held on May 4 and May 25, 1964, and agreed that they would not assert or urge in any proceeding ''now or hereafter pending in any court of competent jurisdiction'' that they did not receive notice of any such hearings.

The District bond election was held on June 16, 1964 at which the two corporate owners of the land in the District were the only voters.[3] Upon canvass of the voters, the Council

[3] Pursuant to § 706 of the ordinance the said owners were entitled to cast one vote on each measure for each $1 of assessed value of the land, real property, or the taxable property owned by it, and whichever was designated by resolution as the tax base for the bonds for the project designated in such measure.

adopted a resolution that a majority of all the votes cast were in favor of and approved the respective measures. Thereafter, and on July 6, 1964, the Council passed resolutions authorizing the issuance of the bonds for each project.[4] Respondent refused to cause said bonds to be printed on the grounds that the Council did not have the power to enact the ordinance; that the District was not validly formed; and that the election approving the issuance of the bonds was invalid. Accordingly, the questions raised here may be divided into three parts—those relating to the validity of the procedural ordinance; those having to do with the creation and formation of the District; and those involving the validity of the bond election.

I

THE PROCEDURAL ORDINANCE

■ A. *Is the Procedural Ordinance Invalid Because Section 74 of the City's Charter Precludes the Use of Such an Ordinance to Make the Contemplated Improvements?*

*NO.* The City is a chartered city organized pursuant to sections 6 and 8 of article XI of the California Constitution. Section 74 of its charter deals with streets and other public improvements. With respect to the instant inquiry the pertinent provisions are as follows: "The improvement, widening, extending, opening and closing of streets or rights of way . . . and the making of any other improvements authorized by the laws of the State *may* be done and assessments therefor *may* be levied in conformity with and under the authority conferred by the general laws of the State . . . ; provided, however, that the Council may by ordinance adopt a procedure for the improvement of streets, alleys, rights of way or other public places, the laying of pipe and conduits and the removal from buildings, lots and grounds, and the sidewalks opposite thereto, of dirt, rubbish, weeds and other rank growth and materials. . . . It is the intention of this Charter *to permit* the Council of said City to proceed in all matters referred to in this section under the general laws of the State. . . ." (Italics added.)

Respondent contends that section 74 precludes the use of the procedural ordinance to create four of the five contemplated projects because they are not the types of improvements which can be provided for by procedural ordinance. The

[4]Resolution No. 4351 provided for the issuance of bonds in the principal sum of $70,168,000 for Project A, and Resolution No. 4352 in the principal sum of $106,227,000 for the other projects.

thrust of respondent's argument is that these improvements are not specifically mentioned as the types of work which may be done under a procedural ordinance, and that the words " 'other public places' " must, under the doctrine of *ejusdem generis*, be interpreted to mean other public places in the nature of types of work specifically mentioned. Accordingly, it is respondent's position that the projects which are the subject of the present proceeding may only be performed, pursuant to section 74, in conformity with the general laws of the state. Petitioner responds to these contentions with the assertion that the subject provisions of section 74 are merely permissive, and that, in any event, section 74, which was a part of the original charter adopted in 1929, is controlled by the provisions of section 3 of the charter adopted in 1954.[4a]

When the City framed and adopted its charter in 1929 it did not avail itself of the "home rule" provisions of the California Constitution (§§ 6 and 8 of art. XI);[5] and it was

[4a]§ 3 of the charter provides as follows: "The city shall have all the powers heretofore claimed or exercised by the city, shall have all the powers granted to municipal corporations and to cities by the constitution and general laws of this state, together with all the implied powers necessary to carry into execution all the powers granted, and shall retain all rights, interests, powers and privileges heretofore gained by the city or any of its departments, boards, commissions or instrumentalities by virtue of any grant or law or by any judicial interpretation of any such grant or law. The city may acquire property within or without its corporate limits for any city purpose, and may manage, control and dispose of such property as its interests may require; and, except as prohibited by the state constitution or restricted by this charter, the city shall and may exercise all municipal powers, functions, rights, privileges and immunities of every name and nature whatsoever. The enumeration of particular powers by this charter shall not be deemed to be exclusive, and in addition to the powers enumerated therein or implied thereby, or appropriate to the exercise of such powers, it is intended that the city shall have and may exercise all powers which, under the state constitution, it would be competent for this charter to enumerate." (As amended April 13, 1954, ratified by Legislature January 13, 1955, Stats. 1955, ch. 27.)

[5]Insofar as pertinent to the present case, the applicable provisions of §§ 6 and 8 read as follows:

§ 6: "Cities . . . hereafter organized under charters framed and adopted by authority of this Constitution are hereby empowered, . . . to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws." (Adopted in 1914.)

§ 8: "It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws." (As amended in 1922.)

not until 1954 when it adopted section 3 of the charter (ratified by the Legislature in 1955), that the City elected to accept the privilege of autonomous rule. It is clear from the language of section 3 that the City has availed itself of the "home rule" provisions of the Constitution "to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters. . . ." (See *Civic Center Assn.* v. *Railroad Com.,* 175 Cal. 441, 447 [166 P. 351] ; *City of San Jose* v. *Lynch,* 4 Cal.2d 760, 762-763 [52 P.2d 919] ; and *Wiley* v. *City of Berkeley,* 136 Cal.App.2d 10, 12 [288 P.2d 123], where charter provisions less specific than those of section 3 were held to constitute an election by a city to avail itself of the "home rule" provisions of the Constitution.)

We thus have a situation, prior to the adoption of section 3 in 1954, where, insofar as the City's charter provided for matters solely of municipal concern, it was paramount to general laws, but where, as to municipal affairs for which it did not provide and upon affairs not municipal, it was still subject to the operation of general law. (*Civic Center Assn.* v. *Railroad Com., supra,* p. 447.) Upon the adoption of section 3, however, the City's power over *exclusively* municipal affairs became all-embracing, restricted and limited only by its charter, and free from any interference by the state through general laws. (*Professional Fire Fighters, Inc.* v. *City of Los Angeles,* 60 Cal.2d 276, 291 [32 Cal.Rptr. 830, 384 P.2d 158] ; *Civic Center Assn.* v. *Railroad Com., supra,* p. 448; *City of San Jose* v. *Lynch, supra,* pp. 763-764; *City of Grass Valley* v. *Walkinshaw,* 34 Cal.2d 595, 598-599 [212 P.2d 894].) It should be here noted that when section 3 was adopted in 1954 no attempt was made to repeal section 74. Accordingly, in the present inquiry the two sections must be read together and we must determine the effect of the former upon the latter. We need not, therefore, concern ourselves with whether the subject projects might properly have been within the purview of a procedural ordinance enacted pursuant to section 74 prior to the adoption of section 3. Our inquiry is properly directed to the applicability of section 74 to the subject procedural ordinance, adopted in 1964, in the light of the provisions of section 3.

In *Lynch,* an original section of the freeholder's charter of the City of San Jose provided that where the cost of any public street improvement was to be paid by special assessment on private property, the general state law in force at the time

should govern and control. A later amendment was added providing that the city had the right and power to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in the charter; and that where the general laws of the state provided for a procedure for the carrying out and enforcement of any rights or powers belonging to the city, said procedure should control and be followed unless a different procedure was provided for in the charter or by ordinance. This amendment also specifically provided that it was the intention of the people of San Jose to take advantage of the amendment to the Constitution giving cities "home rule" as to municipal affairs. Thereafter the city council adopted a procedural ordinance for public improvements. The petition for a writ of mandate was to compel the city clerk to publish a resolution of the council which complied with the ordinance but did not comply with general law. The Supreme Court held that the amendment to the charter was a definite attempt to give to the City of San Jose unfettered "home rule" as to purely municipal affairs; that it was intended as an amendment to the entire charter, rather than amending separately each section relating to matters purely of municipal character; and that, in accordance with settled rules of construction, the provision last in point of time limited the earlier provision to special assessment street improvements for which a procedure differing from the general law had *not* been provided by the charter or ordinance *at the time* of the improvement. The rationale of *Lynch* is that the language of the "home rule" section "shall have been provided" spoke *in futuro*; that it did not refer to the provisions of the earlier section as they existed in the charter at the time of its adoption, but rather to any procedure thereafter set up either in the charter or by ordinance; and the procedural ordinance there involved was a "different" procedure provided solely and exclusively by the ordinance.

Applying the rationale of *Lynch* to the instant case we conclude that by adopting section 3 it was the intention of the people of the City to adopt "home rule" and to amend the entire charter with respect to matters solely of municipal concern. The section is specific in this respect by its proviso that "except as prohibited by the state constitution or restricted by this charter, the city shall and may exercise all municipal powers, functions, rights, privileges and immunities of every name and nature whatsoever." Unlike the "home rule" section in *Lynch,* section 3 does not contain a provision that the

general law controls unless a different procedure is thereafter set up either in the charter or by ordinance. It does not, however, completely bar the use of the general laws of the state as a procedure for the carrying out and enforcement of any rights or powers belonging to the City. This is apparent from a reading of the first sentence of section 3 which provides that the City "shall have all the powers heretofore claimed or exercised by the city" and "shall have all the powers granted to . . . cities by the constitution and general laws of this state. . . ." Accordingly, pursuant to section 74 the City may still invoke the procedure provided by general law. It is apparent from a reading of section 74 that the City may follow the general laws in the making of improvements. However, it is not required to do so because by its very language section 74 is permissive and not mandatory. This is evident from the use of the phrases "and the making of any other improvements . . . *may* be done" and "It is the intention of this Charter to *permit* the Council . . . to proceed in all matters referred to in this section under the general laws of the State. . . ." (Italics added.) We agree with respondent that insofar as section 74 is concerned, of the five subject projects, only the streets and highways project could be done by procedural ordinance because the use of such an ordinance is limited to streets, alleys, rights-of-way, public places, the laying of pipes and conduits, and the removal of dirt, rubbish, weeds and rank growth. However, since the adoption of section 3, and in the light of the principles enunciated in *Lynch,* the City is not required to follow section 74. There is nothing in the charter which specifically provides that a procedural ordinance may be used *only* for enumerated improvements. ▪ As said in *City of Grass Valley* v. *Walkinshaw, supra,* 34 Cal.2d 595, "by accepting the privilege of autonomous rule the city has all powers over municipal affairs . . . subject only to the clear and explicit limitations and restrictions contained in the charter. . . . A construction in favor of the exercise of the power and against the existence of any limitation or restriction thereon which is not expressly stated in the charter is clearly indicated. So guided, reason dictates that the full exercise of the power is permitted except as clearly and explicitly curtailed." (Pp. 598-599.)

A case in point is *City of Glendale* v. *Trondsen,* 48 Cal.2d 93 [308 P.2d 1]. There the Supreme Court was called upon, among other things, to consider a provision in the City of Glendale's charter similar in language to the provision in

section 74. The reviewing court held that the provision merely provided for nothing more than a permissive method by which rubbish may be required to be removed, and not a limitation on other methods ''when we consider the nature of the power of chartered cities as shown by the *Ainsworth*[6] and *Walkinshaw* cases and other cases and authorities cited therein.'' (P. 101.)

██ B. *Is the Procedural Ordinance Invalid Because the City Cannot Make Improvements in the Absence of a Grant of Power in the Charter?*

*NO.* Respondent contends that the City cannot make improvements and assess the costs thereof pursuant to the procedural ordinance in the absence of a grant of power in the charter. This argument is fallacious because it assumes that there must be a grant of power before the City can operate. This is contrary to the concept of the home rule provisions of the California Constitution. In *Walkinshaw,* it was held that by accepting the privilege of autonomous rule under a home rule charter a city has *all* powers over municipal affairs, otherwise lawfully exercised, subject only to the clear and explicit limitations and restrictions contained in the charter; that a charter ''operates *not as a grant of power,* but as an *instrument of limitation* and restriction on the exercise of power over all municipal affairs which the city is assumed to possess; and the enumeration of powers does not constitute an exclusion or limitation.'' (Pp. 598-599; citing *West Coast Advertising Co.* v. *City & County of San Francisco,* 14 Cal.2d 516, 521-522, 525 [95 P.2d 138], and cases therein listed.) With the exception of *Raisch* v. *Myers,* 27 Cal.2d 773 [167 P.2d 198], the cases cited by respondent in support of the rule that a charter is a specific grant of power, and not a limitation upon general powers, are distinguishable because they either deal with situations occurring prior to 1914 when the home rule provisions of the California Constitution were adopted,[7] or involved the extent of the powers of a municipal corporation purporting to act pursuant to a general state law in matters involving state rather than municipal affairs.[8] With respect

[6]*Ainsworth* v. *Bryant,* 34 Cal.2d 465 [211 P.2d 564].

[7]*City Street Improvement Co.* v. *Pearson* (1919) 181 Cal. 640, 648 [185 P. 962, 20 A.L.R. 1317]; *Gassner* v. *McCarthy* (1911) 160 Cal. 82, 85-86 [116 P. 73]; *Mardis* v. *McCarthy* (1912) 162 Cal. 94 [121 P. 389]; *Hayne* v. *City & County of San Francisco* (1917) 174 Cal. 185 [162 P. 625]; *Larsen* v. *City & County of San Francisco* (1920) 182 Cal. 1 [186 P. 757].

[8]*Von Schmidt* v. *Widber,* 105 Cal. 151 [38 P. 682] (powers of municipality pursuant to ''Consolidation Act''); *Harden* v. *Superior Court,* 44

to the *Raisch* case, respondent misconstrues its holding. It was there held that the improvement of streets is a municipal affair, and that the provisions of a street improvement ordinance adopted by a chartered city supersede state law. In discussing the basis of its holding, the Supreme Court stated that the provisions of the ordinance " '*adopted pursuant to the authorization of the charter* have the same sanction and the same effect that they would have had if incorporated in the charter itself.' " (P. 779; italics added.) Respondent contends the italicized language affirms the principle that a charter can only operate as a grant of power, and takes the italicized language out of context so as to glean from it the interpretation asserted. When read in context it is clear that the Supreme Court did not intend to convey the idea that a charter when dealing in municipal affairs can only do so pursuant to an express grant of power. The reference is obviously to the fact that the charter provided for the adoption of an ordinance such as the one in question, and not that it could only adopt such an ordinance if the charter so provided. The intent of our Supreme Court is made clear by its later unequivocal expression in *Walkinshaw* that "The former guide—that municipalities have only the powers conferred and those necessarily incident thereto (*San Francisco* v. *Boyle* [*In re City & County of San Francisco*], 195 Cal. 426 [233 P. 965])—is inapplicable." (P. 599.)[9]

■ C. *Is the Procedural Ordinance Invalid as an Unlawful Delegation to the Landowners Within the District of the Power to Determine Whether a Bond Election Is to Be Held?*

*NO.* Respondent claims that there is an unlawful delegation of powers to the landowners because under the ordinance the owners of at least 51 per cent of the assessed value of the tax base in the District may petition that the bonds be issued not

Cal.2d 630 [284 P.2d 9] (holding that a municipal corporation has no inherent power of eminent domain and can only exercise such power when expressly authorized by general law, pp. 640-641); *Cockerill* v. *City of Redding*, 198 Cal.App.2d 108, 114 [17 Cal.Rptr. 754] (general law as to annexation); *Daily* v. *City of Pomona*, 207 Cal.App.2d 637, 640-641 [24 Cal.Rptr. 618] (general law as to annexation). (See *People* v. *City of Los Angeles*, 154 Cal. 220, 225 [97 P. 311]; and *County of San Mateo* v. *City Council*, 168 Cal.App.2d 220, 221 [335 P.2d 1013], holding that annexation is clearly not a municipal but a state affair.)

[9]The *Boyle* case relied upon *Von Schmidt* (105 Cal. 151), upon which respondent places great reliance. The *Gassner* case (160 Cal. 82), likewise relied upon *Von Schmidt*. It is apparent that *Walkinshaw* overruled these cases insofar as they purport to hold that a home rule charter operates as a grant of power.

under a general obligation bond election but by resolution and hearing (§ 810(a)), or may petition that all proceedings be discontinued (§ 810(b)). Accordingly, relying upon the general principle that the public powers or trusts devolved by law or charter upon a governing body cannot be delegated to others (*Knight* v. *City of Eureka,* 123 Cal. 192, 195 [55 P. 768]; *Thompson* v. *Board of Trustees,* 144 Cal. 281, 283 [77 P. 951]), respondent asserts that, because such landowners can deprive the Council of authority to determine whether the issuance of bonds is to be submitted to the electors within the District, such deprivation constitutes an unlawful delegation of the Council's power to determine whether an election shall be held.

The right of owners to modify or terminate proceedings has to do with that portion of the ordinance providing for the issuance of general obligation bonds by a district. It provides that the percentage of landowners above mentioned may petition the Council that such bonds be issued without the necessity of a bond election pursuant to resolution of the Council after hearing as provided in the ordinance. The ordinance does not, however, compel the Council to accept this procedure but provides that "the council *may,* if it determines to proceed, authorize bonds pursuant to sections 813 and 814," (i.e., the resolution and hearing procedure). The ordinance also provides that such landowners may petition the Council to abandon all proceedings with respect to the authorization of general obligations. The Council, however, is not required under the ordinance to accede to this petition, but has the option to terminate the proceedings with respect to the project under consideration or it may determine to proceed and authorize the bonds under the resolution and hearing procedure aforementioned. The apparent purpose of these alternatives on the part of the landowners is to obviate the situation where a relatively few registered electors, who may own little or no property in a district, can determine the question whether a bonded indebtedness should be incurred and amortized by taxes upon the property of the landowners of all or a substantial part of the District who would have no voice in the matter. These rights given to the landowners do not amount to a delegation of any of the Council's powers. At most they amount to a request that the Council proceed to issue the bonds pursuant to their own resolution (after a hearing) rather than by a bond election. The Council's powers are in no way negated or diminished; to the contrary, they are increased

because the Council, rather than the electors or the landowners, authorizes the issuance of the bonds. Moreover, in the present case, we are not concerned with any of these procedures because the landowners did not petition the Council to terminate the proceedings or to invoke the resolution and hearing procedure. The general obligation bonds were authorized pursuant to a landowners *election* as provided in the ordinance because there were no registered electors living within the District.[10]

## II

### THE FORMATION OF THE DISTRICT

■ A. *Is the Creation of the District Within the Power of the City?*

*YES.* Both sections 6 and 8 of article XI of the California Constitution provide that cities and municipalities may "make and enforce all laws and regulations in respect to municipal affairs. . . ." ■ In view of the failure of the various sections of article XI to define municipal affairs, "it becomes necessary for the courts to decide, under the facts of each case, whether the subject matter under discussion is of municipal or statewide concern." (*Professional Fire Fighters, Inc.* v. *City of Los Angeles, supra,* 60 Cal.2d 276, 294; *In re Hubbard,* 62 Cal.2d 119, 127-128 [41 Cal.Rptr. 393, 396 P.2d 809].) ■ The determination of this question depends, in each instance, upon the legislative purpose. (*Professional Fire Fighters, Inc.* v. *City of Los Angeles, supra,* p. 294.) ■ The constitutional concept of municipal affairs is not a fixed or static quantity but changes with the changing conditions upon which it is to operate. (*Pacific Tel. & Tel. Co.* v. *City & County of San Francisco,* 51 Cal.2d 766, 771 [336 P.2d 514]; *Los Angeles Brewing Co.* v. *City of Los Angeles,* 8 Cal.App.2d 391, 397 [48 P.2d 71].) ■ Moreover, a particular subject may be both a municipal affair and of statewide concern. (*In re Hubbard, supra,* p. 127.)

■ B. *Are all of the Five Projects in the Present Case Municipal Affairs?*

*YES.* Respondent does not claim that the sewerage project (see *City of Glendale* v. *Trondsen, supra,* 48 Cal.2d 93, 99), the streets and highways project (see *Raisch* v. *Myers, supra,*

---

[10]Respondent raises questions of severability in case certain sections of the ordinance should be held invalid. We deem it unnecessary to discuss these questions because we find no invalidity in the ordinance.

27 Cal.2d 773, 778-779), the water project (see *Smith* v. *City of Glendale,* 1 Cal.App.2d 463, 466 [36 P.2d 1083]), or the parks and recreational facilities project (see *Wiley* v. *City of Berkeley, supra,* 136 Cal.App.2d 10, 14; and *Adams* v. *Ziegler,* 22 Cal.App.2d 135, 137 [70 P.2d 537]), are not municipal affairs—her claim is that the reclamation project is not. She points out that the reclamation of lands has been held to be of statewide concern and is not a municipal affair, even though a reclamation district is wholly within a chartered city, and in support of this contention, relies upon *Islais Creek Rec. Dist.* v. *All Persons,* 200 Cal. 277 [252 P. 1043]; and *Peterson* v. *Board of Supervisors,* 65 Cal.App. 670 [225 P. 28]. Petitioner, in turn, asserts that reclamation may be a municipal affair in certain instances, and that, in any event, Government Code section 38901, enacted in 1963, is controlling.[11] With respect to this statute, respondent asserts that since the determination of what constitutes a municipal affair is a constitutional question determinable by the courts, the Legislature did not have the power to make the determination by statutory enactment.

Respondent has not cited a case, nor has any come to our attention, which holds that all aspects of reclamation, under all circumstances, are exclusively of statewide concern. Research discloses that *Islais* and *Peterson* are the only cases after 1914 which directly involve the validity of the formation of reclamation districts within the limits of a city on the basis that the acting body lacked the power to create the district. In both cases the district was formed by a special act of the Legislature. We find no case where a municipality has attempted to form a reclamation district pursuant to its home rule powers, and hence the instant case is of first impression in this respect.

The *Islais* and *Peterson* cases do not hold that a city is precluded from proceeding with reclamation, but merely hold that reclamation is a legitimate exercise of the police power of the state. The essential holding of *Peterson* is that the Legislature in providing for a reclamation district within the limits of the City of Benicia was not interfering with the municipal

---

[11]Gov. Code § 38901 provides as follows: ''A city may reclaim public and private lands therein by levees, bulkheads, breakwaters, fills, embankments, basins, drains, canals, excavations, sluices, pipes, watergates, pumping plants, and all works and structures useful therefor. Such work is a local improvement and a municipal affair. The costs of reclamation shall be borne solely by the lands reclaimed. This section shall not be construed as affecting any public district or public entity now or hereafter established and having similar powers.''

affairs of the city but that it was only doing what it was empowered to do under and by virtue of the powers conferred by section 13 of article XI of the California Constitution.[12] While there is language in the case to the effect that the reclamation of private property within the exterior boundaries of the city "is not a municipal purpose,"[13] (p. 677) *Peterson* was dealing particularly with the City of Benicia which was then a city of the sixth class and did not have the power to reclaim private lands. The pivotal holding of the reviewing court was that the reclamation district provided for by an act of the Legislature was an agency or aim of the state separate and distinct from the City of Benicia, and that their powers did not conflict even though they covered and included a portion of the same territory. *Islais* was merely concerned with the validity of a reclamation district created by the Legislature by statute within the City and County of San Francisco, and is authority solely for the proposition that the creation of a reclamation district is an exercise of the police power of the state and not obnoxious to either the state or federal Constitution.

At oral argument respondent called our attention to the case of *Palo Verde Irr. Dist.* v. *Seeley,* 198 Cal. 477 [245 P. 1092], which, in turn, cites *Barber* v. *Galloway,* 195 Cal. 1 [231 P. 34].[14] *Palo Verde* involved a Legislature-created district and is authority for the principle that the Legislature has plenary power over districts organized for reclamation purposes. It is apparent from a reading of the case that it was dealing exclusively with a district created by general state law and not pursuant to home rule charters. ▪▪▪ The

---

[12]§ 13 provides, in pertinent part, that the Legislature shall not delegate to any special commission, private corporation, company, association or individual the power to interfere with municipalities or their functions except "to provide for the supervision, regulation and conduct, . . . of the affairs of irrigation districts, *reclamation districts* or drainage districts, *organized or existing under any law of this State.*" (Italics added.)

[13]The appellate court was there speaking of "municipal purposes" with respect to the applicability of section 12 of article XI of the Constitution which provides that the Legislature shall have no power to impose taxes upon municipalities for "municipal purposes," but may by general laws vest the power to do so in the corporate authorities of counties, cities or towns.

[14]While the opinions in *Palo Verde* and *Barber* were written after the constitutional amendments granting home rule, the rule therein announced is traceable to *Reclamation Dist.* v. *Birks,* 159 Cal. 233, 238 [113 P. 170], which was decided prior to the adoption of such amendments.

*Palo Verde* case quotes the language of section 13 of article XI, to wit, " 'reclamation districts . . . organized or existing under any law of this State' " as authority for the principle therein announced. (P. 483.) We think that this section, properly construed in the light of the principles declared in *Professional Fire Fighters* (60 Cal.2d 276) and *Pacific Telephone,* (51 Cal.2d 766), does not preclude reclamation as a municipal affair, but purports only to give the Legislature plenary power over a reclamation district when it is created pursuant to state law and thus becomes a matter of statewide concern. This conclusion finds support in the provisions of Government Code section 38901, hereinbefore quoted in full, providing in essence that a city may reclaim public and private lands and that such work is a local improvement and a municipal affair.

Respondent contends that the Legislature cannot determine what constitutes a municipal affair; that this is a function reserved for the courts; and that *only* a constitutional amendment can reverse the findings of the courts. In support of this contention respondent cites *Los Angeles Brewing Co.* v. *Los Angeles, supra,* 8 Cal.App.2d 391, where it was held that what was formerly held by the courts to be a municipal affair can be transferred into a matter of statewide concern by constitutional amendment. This is not authority, however, for the principle that it takes a constitutional amendment to change a municipal affair into a matter of statewide concern, or vice versa. As we have pointed out above, the constitutional concept of municipal affairs is not a static quantity, but changes with the changing conditions upon which it is to operate. Whether such a change has taken place can, of course, be determined by the courts, under the facts of each case, and in making that determination the courts will look to the legislative purpose in each individual instance. (*Professional Fire Fighters, Inc.* v. *City of Los Angeles, supra,* p. 294.) In *Professional Fire Fighters,* it was clearly held that the Legislature can enact a statute making a municipal affair subject to general law on the basis of statewide concern. It was there held that, because labor relations are of statewide concern, the Legislature could, by statute, authorize fire fighters to organize and join labor organizations, and that such statutes were applicable to a city whose charter provisions, ordinances and regulations, inconsistent with such statute, must give way.

The plain holding of *Professional Fire Fighters* is that the Legislature does have the power to change a municipal

affair into a matter of statewide concern, and thus impinge upon local control, where it is the legislative purpose to deal with the particular subject matter under discussion on a statewide basis. (See *Helmer* v. *Superior Court*, 48 Cal.App. 140, 141 et seq. [191 P. 1001]; *Key System Transit Co.* v. *City of Oakland*, 124 Cal.App. 733, 741 [13 P.2d 979]; *People* v. *Western Air Lines, Inc.*, 42 Cal.2d 621, 635 [268 P.2d 723].)

In the present case we have a situation which is the reverse of that considered in *Professional Fire Fighters*. Here, the Legislature has specifically indicated a purpose to make reclamation a municipal affair to the limited extent provided for by Government Code section 38901, i.e., that a city may reclaim public and private lands *within its territorial limits* in the manner therein provided. This statute not only specifically provides that such reclamation work is a municipal affair, but recognizes that reclamation may also be a matter of statewide concern when it provides that the section does not affect any public district or public entity "now or hereafter established and having similar powers." ▮ While a declaration of policy by the Legislature is not necessarily binding or conclusive upon the courts, it is entitled to great weight and will not be interfered with by the courts unless it clearly appears to be erroneous and without reasonable foundation. (*Housing Authority* v. *Dockweiler*, 14 Cal.2d 437, 449-450 [94 P.2d 794].)

▮▮ In view of the foregoing, we hold that a reclamation project may be both a municipal affair and of statewide concern; that it is not exclusively a matter of state concern; and that by the enactment of Government Code section 38901 the Legislature has indicated a legislative purpose that reclamation work by a city within its territorial limits, and to the extent therein provided, is a municipal affair. In the instant case no question is raised that the City has not complied with the provisions of the subject statute. Accordingly, we hold that the subject reclamation project is a municipal affair.

▮ C. *Is the Creation of the Improvement District a Municipal Affair?*

*YES.* It is obvious that if each of the five projects is a municipal affair the local agency which will carry them out must necessarily also be a "municipal affair." Under section 6 of article XI chartered cities are empowered "to make and enforce all laws and regulations in respect to municipal affairs. . . ." ▮ As was indicated in *Walkinshaw*, if a

municipality is carrying out municipal affairs, such affairs may not "be held to be circumscribed except as expressly limited by the charter provisions." (34 Cal.2d at p. 599.)

■■■ D. *Does the City Need Statutory Authority to Create the Improvement District?*

*NO.* It is respondent's position that the powers of the District are in excess of those of a normal assessment district, and that it takes statutory authority to give the City power to create the District. This argument is invalid on the basis that the City's power as to municipal affairs, not expressly forbidden by the state Constitution or the terms of its charter, is plenary and needs no statutory authority. (See *City of Redondo Beach* v. *Taxpayers, Property Owners, etc., City of Redondo Beach,* 54 Cal.2d 126, 137 [5 Cal.Rptr. 10, 352 P.2d 170] ; *West Coast Advertising Co.* v. *City & County of San Francisco, supra,* 14 Cal.2d 516, 522; and see *City of Grass Valley* v. *Walkinshaw, supra,* 34 Cal.2d 595, 599.) As we have already pointed out there are no constitutional inhibitions to the projects or the agency authorized to carry them out, nor are there any provisions in the City's charter preventing the formation of such a District. It is to be noted that the District under consideration is not a separate legal entity, but only an agency or aim of the City empowered only to accomplish the particular projects specified, and that under the provisions of the procedural ordinance title to the District property is in the City.

■■■ E. *Does the Size and Importance of This District Preclude its Formation by the City?*

*NO.* The argument is made by respondent that the magnitude of the reclamation project is a matter of statewide concern because it comprises some 4,300 acres of San Francisco Bay. What we have already said with respect to reclamation being a municipal affair, where it is exercised within a city's territorial limits pursuant to Government Code section 38901, answers this contention. The controlling factor is not the size or magnitude of the reclamation project but rather whether the project is a municipal affair.[15]

---

[15]In respondent's points and authorities it was urged that the District was not validly formed because there were claimed defects in the giving of notice to the landowners in the District and to the utility companies which owned property in the District. At oral argument respondent abandoned these claims of invalidity, and expressly waived any claim or contention that the District was not validly formed on the basis that there was any defect in the giving of the required notice.

## III

### THE BOND ELECTION

**A.** *Does the Procedural Ordinance Violate Section 65 of the City's Charter?*

*NO.* Respondent claims that section 65 requires the bond issue to be submitted to the electors and that this was not done. This section is captioned "Borrowing Money By The City" and commences with the following language: "The City may borrow money for any municipal purposes by the issue and sale of bonds authorized by ordinance pledging the credit of the City or the property or revenue of any public utility owned by the City." It concludes: "The Council of said City is also authorized to proceed under any general law of the State of California . . . with reference to bonding said City and creating a bonded indebtedness *thereon.*" (Italics added.) It is clear that section 65 applies only to bonds involving the credit of the City, which is not the case here. Section 1301 of the procedural ordinance specifically states that "The general fund of the city shall not be liable, and the credit of the city shall not be pledged" for the payment of any general district or improvement district bonds. Section 65 is merely a restatement of the "special fund doctrine" principle contained in section 18, article XI, of the California Constitution prohibiting a city from incurring any indebtedness beyond its revenues in a given fiscal year without approval by a two-thirds vote of the qualified electors. This principle has been held not to be applicable where the general credit of the city is not pledged and the debt is not a general obligation of the entire city. (See *Department of Water & Power* v. *Vroman,* 218 Cal. 206, 217 [22 P.2d 698]; *City of Redondo Beach* v. *Taxpayers, Property Owners, etc., City of Redondo Beach, supra,* 54 Cal.2d 126, 131-132; *City of Glendale* v. *Chapman,* 108 Cal. App.2d 74, 80, 83 [238 P.2d 162].)

**B.** *Does the Procedural Ordinance Violate Section 91 of the City's Charter?*

*NO.* Respondent claims that section 91 "requires that arguments for and against any proposition to be submitted to the voters be submitted to the qualified electors of the city in accordance with the general laws of the State of California."[16] No such arguments were submitted in the

---

[16] § 91 of the charter provides: "Arguments for and against any proposed City charter, any proposed amendment to the City charter,

584

instant bond election. We think that the pertinent language of the charter to be considered in our present inquiry is "any proposal for the issuance of bonds by the City" rather than the words "any . . . proposition" as suggested by respondent. While we are of the opinion that such arguments are required in conjunction with a bond election submitted to the voters of the City, we are persuaded that under the circumstances of the instant case they were not required. The election with which we are here concerned was one in which the voters were the landowners of the District. It would be meaningless to submit arguments to the entire City electorate in such an election. Section 91 does not call for an election when there is a proposal for the issuance of bonds by the City, but merely provides that arguments for or against such proposal (or any other question, proposition or measure) shall be submitted to the qualified electors of the City *if* the proposal is to be "submitted to the voters of the City. . . ."

 C. *Does the Procedural Ordinance Violate Section 4 of the City's Charter?*

*NO.* Respondent claims that the procedural ordinance is inconsistent with section 4 of the charter and hence is invalid.[17] The bond election in the instant case was held pursuant to the provisions of the procedural ordinance and not in accordance with any general law of the state. It is respondent's contention that section 4 required the instant bond election to be held in conformity with the general laws of the state. Petitioner, on the other hand, contends that

any proposal for the issuance of bonds by the City, or any other question, proposition or measure submitted to the voters of the City, shall be submitted to the qualified electors of the City in accordance with and pursuant to the applicable provisions of the general laws of the State of California." (§ 91 as amended April 10, 1962, ratified by Legislature June 29, 1962.)

[17] § 4 of the charter provides: "General municipal elections shall be held in said city on the second Tuesday in April of each even-numbered year under and pursuant to the provisions of the general laws of the State of California governing nominations and elections in general law cities, so far as the same may be applicable, and except as herein otherwise provided. All other municipal elections that may be held by authority of this charter or of general law shall be known as special municipal elections, and shall be held substantially as in this charter provided for general municipal elections; provided, however, that special elections to authorize municipal or local public improvement or the levy of assessments therefore, or to create a municipal bonded indebtedness, shall be held in conformity with any general law of the state relative thereto under which any such proceeding is instituted by the Council, in case such general law provides for the procedure and manner of holding elections thereunder." (As amended April 8, 1958, ratified by Legislature April 18, 1958.)

since the election was not called pursuant to a general law which provided a procedure for holding elections, an election procedure had to be provided for in the procedural ordinance.

The first paragraph of section 4 is clearly not applicable because it was not a "general municipal election" held "on the second Tuesday in April," the election having been held on June 16, 1964. The provisions pertinent to our inquiry are contained in the second paragraph of section 4, the first part of which provides that "All other municipal elections," i.e., other than general municipal elections, are to be known as "special municipal elections," and shall be held substantially as provided for general municipal elections, i.e., as provided in the first paragraph, to wit: "[P]ursuant to the provisions of the general laws of the State of California governing . . . elections in general law cities, so far as the same may be applicable. . . ." The second paragraph contains an important proviso, however, which is applicable here. It provides "that *special elections to authorize municipal or local public improvement or the levy of assessments therefor,* or to create a municipal bonded indebtedness, shall be held in conformity with any general law of the State relative thereto *under which any such proceeding is instituted by the Council,* in case such general law provides for the procedure and manner of holding elections thereunder." (Italics added.)

In view of the language of section 4 and its chronology, we are of the opinion that it is not applicable to the election here under consideration. The subject election and the proceedings antecedent to it were not instituted by the Council under any general law of the State *but pursuant to the procedural ordinance.* As we have already pointed out the procedural ordinance was a valid exercise of the City's home rule power. ▆▆ Under such power the City was entitled to provide for election procedures since such procedures in a chartered city are municipal affairs. (See *Socialist Party* v. *Uhl,* 155 Cal. 776, 788 [103 P. 181].) ▆▆ The only limitation imposed upon this power is the general rule, hereinbefore alluded to, that restrictions on the powers of chartered cities must be expressed and cannot be implied. (*City of Grass Valley* v. *Walkinshaw, supra,* 34 Cal.2d 595, 598-599.) Section 4 contains no expressed restriction against the type of special election held in the instant case. As we read this section it does not purport to encompass all municipal elections, but only those therein specifically mentioned which

must be held in conformity to general law. It should also be noted that section 4 was included in the original charter when it was adopted in 1929 and was amended in certain particulars in 1958, and that the procedural ordinance was adopted in 1964. The ordinance and section 4 are not inconsistent. It is obvious that section 4 did not have the procedural ordinance within its contemplation. Upon the enactment of the latter it became necessary for the Council to provide election procedures necessary to accomplish the objects of the procedural ordinance which were not within the purview of section 4.

It should also be pointed out that even under the procedural ordinance it is provided that, *except as provided therein with respect to elections*, ''any election held pursuant to this ordinance shall be called, held and conducted as nearly as practicable in accordance with the laws applicable to elections in general law cities.'' The instant landowners' election was specifically provided for in the ordinance and therefore was not required to conform to general law. Landowner elections have been approved by the courts (see *People* v. *Reclamation Dist. No. 551,* 117 Cal. 114 [48 P. 1016]; *Barry* v. *Board of Directors,* 7 Cal.App.2d 412, 415 [46 P.2d 298]), and recognized by the Legislature (Health & Saf. Code, § 4975 (Sewer Revenue Bonds); Water Code sections 35003, 50700-50817 (Reclamation Districts Formed Pursuant to State Law).) The laws applicable to elections in general law cities do not provide for landowners' elections. Division 12 of the Elections Code (§§ 22000-23314) relating to ''Special and Local Elections'' apply to registered voters.[18] Since we have no electors in the District, these provisions would not be applicable. Section 22601 of the Elections Code, which is contained in part 2 of division 12 relating to ''Municipal Elections,'' provides that ''The provisions of this part shall apply to all municipal elections *except* where otherwise provided for in the Constitution of the State or in a *charter*. . . .'' (Italics added.) Thus it is apparent that the provisions of this part do not apply where a charter undertakes to provide for municipal elections. In the present case the City has done so, both by charter provision (§ 4) and by the subject procedural ordinance enacted by it under its home rule pow-

---

[18]Elec. Code § 22000 provides: ''Every person is entitled to vote at a local, special, or consolidated election who is registered in any one of the precincts which compose the local, special, or consolidated election precincts in accordance with the provisions of this code.''

ers. ▆▆▆ Moreover, the term "voter" in the Elections Code refers to "any elector who is registered under the provisions of this code" (§ 21); and Division 1, Chapter 2 of said code relating to the "Registration of Electors" provides, among other things, for the requirements necessary to registration. ▆▆▆ These requirements are equated to residence and citizenship, and no mention is made in said chapter of property owners or landowners. (See Elec. Code, § 321—form of "Affidavit of Registration.")

Let a peremptory writ of mandate issue.

Sullivan, P. J., and Bray, J.,* concurred.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.